[Civ. No. 22160. Fourth Dist., Div. One. Mar. 11, 1981.]

SOUTHERN CALIFORNIA EDISON COMPANY et al.,
Plaintiffs and Respondents, v.
STATE WATER RESOURCES CONTROL BOARD,
Defendant and Appellant.

COUNSEL

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, and Joel S. Moskowitz, Deputy Attorney General, for Defendant and Appellant.

Chickering & Gregory, David R. Pigott, James E. Burns, Jr., Samuel B. Casey and John P. Murphy for Plaintiffs and Respondents.

OPINION

**WORK, J.**—Southern California Edison Company and San Diego Gas and Electric Company (Company) object to waste discharge requirements imposed on their San Onofre nuclear generating station (Unit 1)[1] by the San Diego Regional Water Quality Control Board as confirmed by the State Water Resources Control Board (Board).

The permit (referred to as the Unit 1 permit or the permit) set specific standards for discharge of sanitary waste and circulating cooling water.

---

[1] An interim permit (regional board order No. 74-93) issued December 9, 1974, expired on June 9, 1976. The present proceedings involve an order granting a long term permit issued July 14, 1976 (order No. 76-11).

The trial court set aside the contested standards as violating both federal and state law,[2] and beyond the scope of the Board's authority. The matter was remanded to the Board because its findings are inadequate and not supported by the record.

One disputed limitation prescribes waste discharge requirements on a *gross*, rather than *net*, basis and the other sets discharge limitations for Company's *private* secondary sewage treatment plant at the same level as federal standards for *municipal* sewage treatment facilities.

The disputed issues are:

(1) May Board ever lawfully require Company to remove pollutants entering its generating station through its water intake valve, rather than regulating only those pollutants which it actually adds to the water?

(2) May the Board set limitations on waste discharges from Company's private secondary sewage treatment plant equal to federal limitations imposed on municipal sewage treatment facilities?

(3) Are the Board's findings adequate?

(4) Are its findings supported by the record?

FACTUAL BACKGROUND

Company owns and operates San Onofre nuclear generating station (SONGS) on the coast of California midway between Los Angeles and San Diego. SONGS operates a nuclear reactor, known as Unit 1, to generate electrical power.

Unit 1 is a pressurized water reactor heating fresh water into steam before circulating it in a closed system. The steam drives a turbine producing electricity and is eventually condensed into liquid to repeat the process. Steam is liquified in a condenser in a manner similar to an

---

[2]Specifically regulations establishing limitations on the ocean discharge of over 460 million gallons per day of cooling water together with between 12,000 to 17,500 gallons per day output from a secondary sewage treatment plant. Among the constituents Company discharges and proposes to discharge are fecal coliform bacteria, algecides, chlorinated organic compounds, heat, oil, grease, radioactive fission products and activated corrosion products.

automobile radiator, except the cooling agent is ocean water rather than air. Large amounts of ocean water cool the condenser by flowing over it.

The ocean water used to cool the condenser, referred to as the circulating cooling water, enters the reactor through a 12-foot diameter pipe extending 3,200 feet into the ocean. After passing once over the condenser it leaves the plant and is discharged through another 12-foot diameter pipe at a point 2,600 feet off shore. The circulating ocean water used to cool the condenser never contacts the fresh water in the closed system which propels the turbines: its sole function is to cool the condenser.

Certain tributary waste streams are added to the water after it enters the system and, after circulating, are discharged into the ocean along with the original ocean water brought in through the intake pipe. One of these tributary streams is treated sanitary waste consisting principally of sewage produced by personnel operating and maintaining the reactor.[3]

Company originally used septic tanks to dispose of this sewage. When construction of two new units began,[4] and it became necessary to dispose of substantially increased quantities of sanitary waste, Company voluntarily installed a secondary sewage treatment plant in order to purify the additional waste water produced.[5]

When this treatment plant was installed, Company operated under an interim NPDES permit, the renewal of which expired June 8, 1976.[6] The regional board renewed this permit on June 14, 1976. However, the present permit changed the discharge limitations for both the circulat-

---

[3] The water discharged by Unit 1 comes from several principal sources: the circulating cooling water, steam generator blowdown, sanitary waste generated by Units 1, 2 and 3 (see fn. 4, *infra.*) and other low volume wastes.

[4] In addition to Unit 1, two new units, Units 2 and 3, are currently being constructed causing up to 5,200 additional persons to be on the SONGS site. The sanitary waste produced by these people is also disposed of by way of the Unit 1 facility.

[5] The purified discharge from the secondary sewage treatment plant empties into the Unit 1 circulating cooling water discharge pipe, is heated and subsequently discharged into the ocean along with the cooling water.

[6] The Unit 1 permit was issued pursuant to the National Pollution Discharge Elimination System and is referred to as a "National Pollution Discharge Elimination System Permit" or a "NPDES permit." The Unit 1 permit is contained in regional board order No. 76-11.

ing cooling water and the sanitary wastes. It is these changes to which Company objects and the trial court found improper.

The change made to the discharge limitation for the circulating cooling water is significant. Whereas before Company had been given net limits of pollutants or waste it could *add* to the water, the renewal permit, especially with respect to heavy metals, set gross limits for the pollution level of the discharge *without credit for pollutants preexisting in the ocean waters brought into Company's system.* Thus, section A.1(g) of the permit provides: "After July 1, 1978, the *discharge* shall not exceed the following limits: . . ."[7] (Italics added.)

Company correctly perceives a potential burden of removing pollutants from its source water merely for the privilege of circulating it through its cooling system and returning it, otherwise unaltered, to the source; a task it describes as "cleaning" the Pacific Ocean.

The second objection is to the more severe discharge restrictions on sanitary waste effluent from the secondary sewage treatment plant. The levels are drawn from regulations of the United States Environmental Protection Agency (EPA) adopted for municipal sewage treatment plants. Although there is no evidence Company has ever violated any permit requirement,[8] and its plant was installed with the understanding it could meet those limits, it nevertheless challenges the Board's authority to impose EPA standards designed to regulate municipal sewage treatment facilities.

Both the state and regional boards partially operate under a federal statutory scheme granting the state certain responsibilities. The scheme originates with the Federal Water Pollution Control Act (formerly 33 U.S.C. § 1151 et seq.), now known as the Clean Water Act of 1977 (33 U.S.C. § 1251 et seq., the Federal Act). The Federal Act creates a

---

[7] The previous permit contained the words "discharge of waste," which is defined as pollutants *added* by activities of the user.

[8] Company alleges three occasions when discharge from its plant exceeded permit limitations. The principal reason for the higher discharges is the nature of the waste which is being treated, i.e., while the waste is primarily human sewage the input is principally from toilets and not from sinks, appliances, showers and the like. The concentration of fecal matter, therefore, is higher than at most municipal sewage treatment systems because SONGS contains considerably less so-called "grey" water to dilute the fecal waste. No actual violation occurred because the requirements are based on weekly and monthly, rather than daily, averages to compensate for individual "bad days."

system under which the EPA enforces certain minimum standards on water discharges throughout the nation. Qualifying states may authorize additional legislation to implement the provisions of the act within their own jurisdictions so long as such water quality pollution limitations are no less strict than set by the act. (33 U.S.C. §§ 1342(b) and 1370.)

California participates in this scheme pursuant to the Porter-Cologne Act (Wat. Code, §§ 13160-13169 and 13200-13260). The Board has adopted both an "old" and "new" Ocean Plan (Water Quality Control Plan for Ocean Waters of California, adopted and eff. July 6, 1972; and 1978 Water Quality Control Plan for Ocean Waters of California, adopted and eff. 1978) from which the regional board derives its authority to issue the present permit. The parties agree at the time the Unit 1 permit was issued by the regional board, it was subject to the "old" Ocean Plan and on remand will be subject to the "new."

Although neither plan authorizes imposition of waste discharge on a gross basis, the Board contends it is empowered to apply a gross limitation where evidence establishes the beneficial uses of the ocean require stricter standards.[9]

### THE NET VERSUS GROSS ISSUE

■ Company claims the Board lacks jurisdiction, under either federal or state law, to require removal of any pollutants entering its plant through the intake stream.

Company and the trial court each rely on dicta in *Appalachian Power Co. v. Train* (4th Cir. 1976) 545 F.2d 1351, 1377, for the proposition the Federal Act specifically forbids imposition of discharge standards requiring a user to upgrade the quality of source water as a prerequisite for the right to use and discharge it.

The trial court found the Board derives its authority *solely* from the Federal Act, which *Appalachian* construes as allowing the federal agency to regulate only pollutants *added* to the source water. The trial court

---

[9]The Board discharge requirements must "ensure compliance with all applicable provisions of the [federal] act and acts amendatory thereof or supplementary, thereto, together with any more *stringent effluent standards or limitations necessary to implement water quality control plans, or for the protection of beneficial uses, or to prevent nuisance.*" (Wat. Code, § 13377, as amended; italics added.)

incorrectly reasoned the stricter standards allowed to be imposed by a qualifying state are similarly restricted. Its holding would prevent gross discharge limitations regardless of circumstances.

We do not read *Appalachian* as prohibiting gross discharge limitations where transportation of pollutants from intake to outflow actually adversely affects the quality of the receiving waters. For instance: A power plant intaking water close to shore and expelling it unaltered in less polluted waters offshore may well deleteriously affect marine life. In such a case it would be irresponsible to conclude the plant has no duty to clean the incoming water simply because it did not *add* any of its own pollutants to it. Thus, a mechanical application of *Appalachian's* dicta would prevent California from regulating outflow constituents where the very act of transportation and discharge to a point other than at intake adversely impacts water quality; where a plant receives polluted water near a sewage outfall and discharges into an environmentally sensitive area.

The Board's authority is not specifically derived from the Federal Act nor was it created solely to carry out the identical pollution regulating function discussed in *Appalachian*. Rather, it is part of a broad legislative water quality control plan mandating it to set and regulate standards to "attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved . . . ." (Wat. Code, § 13000.)

The state act invests broad responsibility for water quality control in the Board which it defines as "the regulation of *any activity or factor* which may affect the quality of the waters of the state [including] . . . the prevention and correction of water pollution and nuisance." (Wat. Code, § 13050, subd. (i); italics added.) This language clearly grants the power to impose gross limitations on pollutant discharge where necessary to safeguard the quality of the receiving water.

*There Is No Evidence Gross Limitations Are Necessary*

 While the Federal Act allows states or their agencies to enact stricter limitations than those found in the federal guidelines (33 U.S.C. § 1370) the Board's responses to this invitation (the Ocean Plans, *supra*) permit the regional board to set more restrictive limitations than those contained in the *Ocean Plans* only "as necessary for the protection

of the beneficial uses of the ocean." (See also Wat. Code, § 13377, as amended, fn. 9, *ante.*)

Notwithstanding the regional board's authority, therefore, to issue a permit prescribing limits on the "gross" rather than "net" discharge of waste, because the Ocean Plans themselves speak only in terms of "net" requirements, in order for the regional board to issue "gross" limitations it must first enunciate its reasoning; which must in turn be supported by the evidence. (See *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 29 [112 Cal.Rptr. 805, 520 P.2d 29].)

The regional board's order is clearly insufficient in this respect. Indeed, the only findings reflecting the net versus gross issue are numbers 18 and 19.[10] Number 18 merely recites portions of Water Code section 13241 and number 19 is not analytical. Nor is the *Board's* order supported by evidence showing a more stringent standard is necessary to protect *specific beneficial uses of the ocean.*[11] The absence of such evidence makes it impossible to determine whether stricter regulations than those found in the Ocean Plans are in fact "necessary."

While Company may be required, therefore, to eliminate both pollution and the possibility of pollution created by its transportation of

---

[10]"18. The Board, in establishing the requirements contained herein, considered factors including but not limited to the following: [¶] (A) Past, present, and probable future beneficial uses of water. [¶] (B) Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto. [¶] (C) Water quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area. [¶] (D) Economic considerations. [¶] 19. The Board has considered all environmental factors associated with the discharge of waste." (Regional board order No. 76-11, *supra.*)

[11]"We addressed . . . [the] question [of net limitations] in the Rancho Caballero decision, Order No. 73-4, wherein we pointed out that this was an inappropriate and improper method of implementing a water quality control plan. Although the facts in the two cases are dissimilar, nonetheless as we stated in the cited decision, 'The incremental approach does not provide assurance that water quality objectives will be met and that the water quality control plan will be implemented. The inability of the incremental limits to function adequately stems primarily from the fact that they do not provide a means of *placing maximum limits on* the quality of the water *discharged.* As a result, the use of a poor quality water as a source of supply will result in an even poorer quality of waste discharge.' The petitioner offers no evidence that the particular limits imposed on petitioner's discharges are not necessary to adequately protect receiving water quality and has not argued that there are any constituents in its water supply in levels which would render it difficult for the petitioner to comply with its requirements. It has raised solely the argument that it is not legal to place gross constituent limits in waste discharge requirements. We find that the petitioner's argument is without merit." (State board order No. WQ 78-13.)

waste, whether or not it *adds* to such waste, it may not be required to meet standards more stringent than those established by the Ocean Plans *unless* it is shown mere transportation will adversely affect the quality of the receiving water.

Since the Board's findings do not include factual evidence supporting a conclusion gross limitations are necessary to protect any specific beneficial uses of the ocean, they are inadequate.

## MUNICIPAL TREATMENT STANDARDS

When Company first received the interim NPDES permit (regional board order No. 72-26) the sewage produced at SONGS was discharged into septic tanks located at the Unit 1 facility, and then through the Unit 1 cooling water outflow line into the ocean. At the time Unit 1 was the only reactor in operation and the system was adequate.

In issuing the temporary sewage waste discharge permit the Board recognized Company was forced to use septic tank sanitary treatment because no secondary sewage treatment and disposal was available. However, the interim permit specifically required Company to absolutely cease all sewage waste discharge within 120 days of public sewer installation in the San Onofre area. Termination would either totally eliminate human waste from being spewed into the ocean or insure its treatment in accordance with the EPA standards applicable for municipal secondary treatment facilities, those to which Company now objects.

In 1975 the construction of two additional units brought 5,200 more persons to the SONGS site. To dispose of the substantially increased quantities of waste created by this influx, Company installed a secondary sewage treatment plant; informed the regional board its secondary treatment facility was in operation and requested amendment of the interim sanitary waste provisions. The Board chose to wait until the new permit was considered in June 1976. The proposed standards assume this private secondary treatment plant will be the permanent sewage disposal facility and there is no longer a requirement of tying into a municipal system.

Company correctly argues, in effect, it has avoided mandatory imposition of the federal sewage limitations by inducing the Board to drop its requirement to join the public sewage system in exchange for the in-

stalling of its private plant because these apply only to municipal, not private, secondary facilities. The Board, however, is not powerless to set equivalent standards to the high standards clearly contemplated by the language of the interim permit.

The state act provides: "No discharge of waste into the waters of the state, whether or not such discharge is made pursuant to waste discharge requirements, shall create a vested right to continue such discharge. All discharges of waste into waters of the state are privileges not rights." (Wat. Code, § 13263, subd. (g).) Moreover, "[a] regional board, in prescribing requirements, need not authorize the utilization of the full waste assimilation capacities of the receiving waters." (Wat. Code, § 13263, subd. (b).)

Here the federal standards were not applied to Company because the character of its facility is municipal, rather they were used as a guideline in order to establish standards regulating sewage discharge because it operates a *secondary sewage treatment plant*: they specifically consider the issue of waste discharges from secondary sewage treatment facilities although the Ocean Plan does not.

■ As previously noted the Board is specifically empowered to impose "more stringent effluent standards or limitations [than those found in the Ocean Plans as] necessary to implement [the] water quality control plans, or for the protection of beneficial uses or to prevent nuisance" (Wat. Code, § 13377, *supra*), pursuant to a "national goal that the discharge of pollutants into navigable waters be *eliminated* by 1985; ..." (33 U.S.C. § 1251(a)(1); italics added.)

However, in order for the Board to implement stricter standards than those found in the Ocean Plans, it must first hold hearings and then state its reasons explaining why such stricter standards are necessary to effect the purposes of the Water Quality Control Act. (See Ocean Plans, *supra*.) Here, again, the Board's findings are inadequate.

Contention and finding No. 1 of order No. 78-13 (the only finding relating to this issue) simply restates the regional board's limitations and lists 10 beneficial uses established in the new Ocean Plan. It, however, fails to explain how a specific use or uses will be benefited by implementation of the stricter standards or why stricter standards are in fact necessary.

The Board claims no such findings are necessary relying instead on its power to impose "technological" standards pursuant to regional board standard provision No. 6 (included in the regional board order by reference in provision C.9). This provides: "The discharger shall maintain in good working order and operate as efficiently as possible any facility or control system installed by the discharger *to achieve compliance with the waste discharge requirements.*" (Italics added.) Based on this provision the Board argues "[i]f the existing facilities are operated at anything close to a proper level, compliance with the requirements contained in the Regional Board Order should be assured. [¶] It is readily apparent therefore that Order No. 76-11 does not place an onerous burden upon the...Company, since the ... Company can achieve compliance merely by proper operation of the facilities already in place."

The Board fails to recognize, however, the degree of burden which the instant order places on Company is irrelevant at this juncture. Even if the provision applies to the present facility, before Company may be required to comply with its mandate, the waste discharge standards imposed upon Company must be valid. As discussed above, in order for the standards to be valid they must first be found *necessary* for the protection of the beneficial uses of the ocean. Since the Board's showing in this respect is clearly inadequate its reliance on standard provision No. 6 is misplaced.

Based on the foregoing, we reverse so much of the judgment of the superior court as requires the Board to set its waste discharge requirements only on a net basis and remand to the trial court to enter judgment consistent with the views set forth above.

Cologne, Acting P. J., and Staniforth, J., concurred.

A petition for a rehearing was denied March 27, 1981, and respondents' petition for a hearing by the Supreme Court was denied May 20, 1981.