**SIERRA CLUB, a California non-profit corporation, Plaintiff-Appellant,**

v.

**UNION OIL COMPANY OF CALIFORNIA, a California corporation, et al., Defendants-Appellees.**

No. 85–2868.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 10, 1986.

Decided April 3, 1987.

Roger Beers, Stephan Volker, San Francisco, Cal., for plaintiff-appellant.

Patrick J. Cafferty, Jr., San Francisco, Cal., for defendants-appellees.

Amelia S. Salzman, Washington, D.C., for amicus curiae.

Before CHOY, GOODWIN and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge:

The Sierra Club brought a citizen enforcement action against Union Oil Company of California ("Union Oil") alleging that Union Oil violated the terms of its National Pollutant Discharge Elimination System ("NPDES") permit on seventy-six occasions. After a five-day trial, the district court found no violations of the permit. The court excused some of the reported exceedances of permit limitations by application of an upset defense (an excuse for permit violations when circumstances occur that are beyond the reasonable control of the permittee), some on the ground that reports of exceedances were mistakes caused by sampling error, and some by application of a purported de minimus exception to the Federal Water Pollution Control Act ("the Act"). Sierra Club appeals from these rulings and from the district court's denial of its motion for leave to file an amended complaint before trial. We reverse.

Sierra Club's original complaint alleged that Union Oil exceeded its permit limitations on seventy-six occasions during the period between 1979 and 1983. Union Oil's principal defense is that approximately fifty of the exceedances were due to circumstances beyond Union Oil's reasonable control: unusually high levels of rainfall during the winters of 1981–1982 and 1982–1983. Union Oil argues that because these exceedances were caused by exceptional circumstances, Union Oil is entitled to assert an upset defense. Although Union Oil's permit contained no upset defense, Union Oil argues that *Marathon Oil Co. v. Environmental Protection Agency*, 564 F.2d 1253 (9th Cir.1977), and 40 C.F.R. § 122.41 (1986), necessitate the inclusion of an upset defense in the permit. Sierra Club counters by asserting that because Union Oil did not contest the terms of its permit when issued and reissued, Union Oil is barred by the doctrine of exhaustion of administrative remedies from seeking to amend the permit during this enforcement proceeding.

Union Oil's second major defense is that several of the permit exceedances were caused by sampling error, meaning that although reported as exceedances, they were in fact not exceedances. Sierra Club and the Environmental Protection Agency ("EPA") as amicus curiae argue that because accurate self-monitoring is critical to the effectiveness of the Federal Water Pollution Control Act, sampling errors should not be recognized as valid excuses for asserted exceedances of NPDES permits.

This case raises significant questions about the operation of the Federal Water Pollution Control Act. In particular, we must consider the issue of the states' power under the Act to impose more stringent water regulations than those imposed by the Environmental Protection Agency. We must also consider the level to which the viability of a self-monitoring system such as the NPDES requires courts to hold permittees accountable for all errors in reporting.

## BACKGROUND

### I. *Statutory Scheme*

The objective of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376 (1986), is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). As amended in 1972, the Act declares that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." 33 U.S.C. § 125(a)(1). In furtherance of these goals, the Act prohibits the discharge of all pollutants except as authorized by the Environmental Protection Agency. 33 U.S.C. § 1311(a).

The Act requires that the EPA promulgate "effluent limitation" standards [1] for numerous categories of industrial polluters. These standards are principally technology-based, limiting discharges to levels achievable by use of "the best practicable control technology currently available." 33 U.S.C. § 1311(b)(1)(A). Water quality standards are used as a supplementary basis for effluent limitations, so that numerous dischargers, despite their individual compliance with technology-based limitations, can be regulated to prevent water quality from falling below acceptable levels. *Environmental Protection Agency v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 205 n. 12, 96 S.Ct. 2022, 2025 n. 12, 48 L.Ed.2d 578 (1976).

Under the National Pollutant Discharge Elimination System, 33 U.S.C. § 1342, the EPA issues permits to individual dischargers. Under the permit, the generally applicable effluent limitations and other standards become the obligation of the individual discharger. *Environmental Protection Agency v. California,* 426 U.S. at 205, 96 S.Ct. at 2025. The Act requires that each discharger holding a NPDES permit monitor and report on its compliance with its permit. Each discharger must install, use, and maintain monitoring equipment and must sample its effluents. 33 U.S.C. § 1318(a)(4)(A). The discharger must report the results of its self-monitoring to the EPA and the state agency that issues the permit. These self-monitoring reports are to be submitted at intervals specified in the permit. 40 C.F.R. § 122.41(1)(4).

In accordance with the Act's policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," 33 U.S.C. § 1251(b), states that follow the procedures outlined in the Act are authorized to issue NPDES permits to discharging entities within the state. 33 U.S.C. §§ 1251(b), 1342(b). All states must comply with the Act and with the EPA's regulations, but a state may adopt its own effluent limitations and standards so long as they are not less stringent than the EPA's correlative limitations and standards. 33 U.S.C. § 1370. Before a state issues any NPDES permit, it must transmit a copy of the proposed permit to the federal EPA Administrator. The EPA Administrator may object within ninety days to the issuance of the proposed permit and subject it to a review process. 33 U.S.C. § 1342(d)(2).

Actions to enforce the permit terms against the permittee may be brought by the EPA, 33 U.S.C. § 1319, or by concerned citizens, 33 U.S.C. § 1365. The Act provides for criminal and civil penalties to be imposed, with civil fines ranging as high as $10,000 per day for each violation. 33 U.S.C. § 1319(d).

The original regulations promulgated under the Act did not provide for any exceptions to NPDES permit terms when permit exceedances occurred because of conditions outside of the reasonable control of the discharger. In 1977, however, this court determined that, under some circumstances, the Act requires that an upset defense be made available to permittees. In *Marathon Oil,* 564 F.2d at 1272–73, the EPA issued a permit to Marathon Oil for its

---

**1.** An "effluent limitation" is "any restriction established by a State or the [EPA] Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources ... including schedules of compliance." 33 U.S.C. § 1362(11). A "point source" is "any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

offshore oil platforms and onshore facilities, but, in accordance with normal policy, did not include any upset provision in the permit. Marathon requested review by the EPA Regional Administrator and then by the EPA Administrator, challenging the terms of the permit and complaining, inter alia, of the absence of an upset provision. When the EPA Administrators affirmed the permit containing no upset provision, Marathon appealed to this court, as allowed under 33 U.S.C. § 1369(b). We remanded the case with instruction to the EPA to insert an upset provision in Marathon's permit.[2] *Marathon Oil*, 564 F.2d at 1272–73.

After *Marathon Oil* was decided, the EPA amended 40 C.F.R. § 122.41 to include a formal upset provision. The section provides for incorporating the upset defense into all NPDES permits, either explicitly or by reference to the relevant regulations. It defines "upset" as "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee." 40 C.F.R. § 122.41(n). The scope of the upset defense under the section does not include noncompliance caused by "operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." *Id.* The regulation also imposes stringent procedural requirements for asserting the upset defense and places the burden of proof upon the party claiming the defense. *Id.*

The states' role relative to the conditions (one of which is the upset defense) described in 40 C.F.R. § 122.41 is set out in 40 C.F.R. § 123.25. That section provides that states may omit or modify any of section 122.41's conditions to impose more stringent requirements. 40 C.F.R. § 123.25(a)(12). The section concludes by stating:

NOTE: States need not implement provisions identical to the above listed provisions. Implemented provisions must, however, establish requirements at least as stringent as the corresponding listed provisions.

. . . .

For example, a State may impose more stringent requirements in an NPDES program by *omitting the upset provision* of § 122.41 or by requiring more prompt notice of an upset.

40 C.F.R. § 123.25(a) (emphasis added).

## II. *Facts*

Union Oil operates an oil refinery that discharges treated wastewater into the San Pablo Bay (at the north end of San Francisco Bay) from two onshore monitoring stations, referred to as E–001 and E–004. Wastewater discharged through E–001 consists solely of non-contact cooling water, which is saltwater taken from the Bay used primarily to cool refinery equipment containing heated oil without coming into contact with the oil. Wastewater discharged through E–004 contains non-contact cooling water, process wastewater, and stormwater runoff. The process wastewater consists of water contaminated with refining wastes, primarily oil, and a small amount of wastewater from sinks and toilets at the refinery.

For treating the process wastewater and stormwater runoff, the refinery uses a sewer system that routes the water to the wastewater treatment plant (Unit 100). In 1977, Union Oil installed biological treatment equipment, which divides the combined process wastewater-stormwater stream into two separate waste streams and provides different treatment for each stream. The first waste stream, known as the "segregated" waste stream, contains high concentrations of pollutants and is

---

2. In support of this holding we stated:

The Federal Water Pollution Control Act requires point sources of pollution to utilize the "best practicable control technology currently available" prior to 1983. The EPA cannot impose a higher standard without violating the Control Act. And yet the permits as currently written do exactly that.

. . . .

... The EPA is free in writing the formal upset provision to place the burden on the permit holder of producing relevant data and proving that the upset could not have been prevented.

*Marathon Oil*, 564 F.2d at 1272–73.

routed to the wastewater treatment plant via a separate pipe. The segregated stream receives special pretreatment, one or two types of biological treatment in Unit 100, and finally, treatment by the activated sludge-clarifier system, known as the "bioplant." The second waste stream, known as the "unsegregated" waste stream, contains all of the remaining process wastewater and stormwater. The unsegregated waste stream is routed to Unit 100 through a combined sewer system. At Unit 100 this stream is first treated in a system designed to remove both oils and solids from the wastewater. The system has storm basins to store excess flows from the combined sewer system during periods of heavy rainfall. After the unsegregated wastestream undergoes this preliminary treatment, it, along with the segregated waste stream, receives biological treatment in the bioplant.

The biological treatment system has a design capacity of 2500 gallons per minute and is designed to provide treatment at all times to the segregated stream and, under normal weather conditions, to most of the unsegregated waste stream. When the quantity of water to be treated exceeds this level of 2500 gallons per minute, the system automatically treats all of the segregated waste stream and as much of the unsegregated stream as possible. The rest of the unsegregated stream is routed around the bioplant and is later combined with the water that has been treated in the bioplant. As a result, during heavy storms, the water released from the plant may contain pollutants in quantities greater than those allowed under the permit.

Union Oil possesses an NPDES permit issued by the California Regional Water Quality Control Board ("California Water Board"). The initial permit, issued in November 1974, did not contain an upset provision. Union Oil petitioned the State Water Resources Control Board for review of the permit, specifically complaining of the absence of an upset provision. The State Board upheld the permit, stating that providing an upset defense is discretionary with the Regional Board. Union Oil did not appeal from the State Board's ruling. The

permit was amended in 1977 and 1979, and a new permit was issued in 1980. The California Water Board never inserted an upset provision in Union Oil's permit, either explicitly or by reference to the relevant C.F.R. provisions. Union Oil never again requested review of the permit.

Union Oil's permit for the period in question contains provisions to bring it into compliance with the Federal Water Pollution Control Act and with more stringent state pollution standards. Some of these restrictions are based on the best practicable technology currently achievable, and some are based on standards of water quality. The permit contains a specific provision for an upward adjustment of certain effluent limitations for periods of heavy rainfall, by which additional contaminants may be discharged in proportion to the stormwater involved.

On June 4, 1984, Sierra Club filed this citizen suit pursuant to 33 U.S.C. § 1365, seeking injunctive relief and the imposition of civil penalties because Union Oil violated its NPDES permit. Based upon Sierra Club's review of wastewater test results contained in Union Oil's Discharge Monitoring Reports (DMRs) and Non-Compliance Reports (NCRs), Sierra Club alleged seventy-six violations of the permit limitations during the five-year period from 1979 to 1983. Union Oil filed a motion for summary judgment on the ground that many of the permit violations occurred as a result of heavy rainfall during the winters of 1981–1982 and 1982–1983, thus qualifying as upsets under 40 C.F.R. § 122.41(n). The trial court denied the motion.

Trial was set for September 9, 1985. Pursuant to Sierra Club's request for a continuance, the court continued the trial to October 29, 1985. On August 27, 1985, Sierra Club filed a motion for leave to file an amended complaint. The amended complaint included allegations of violations occurring before March 30, 1979. Sierra Club argued that these claims were not barred by the five-year statute of limitations because Sierra Club had been unaware of the facts underlying the claims until December 14, 1979, and because Un-

ion Oil had committed fraud in concealing the violations.[3] Sierra Club also filed a motion for partial summary judgment on the ground that Union Oil could not, as a matter of law, file reports reflecting that it had exceeded its permit limitations and then later challenge its own reports with evidence of sampling errors. The court set hearing of the motions for October 11, 1985. After this date was set, Sierra Club filed a motion for reconsideration of a magistrate's order denying discovery as to events occurring before 1979, which is beyond the federal statute of limitations period. On October 17, 1985, the court denied Sierra Club's motion for partial summary judgment. It also denied Sierra Club's motions for leave to file its amended complaint and for reconsideration of the magistrate's order; the court denied the motions on the grounds of delay, prejudice to defendants, and the fact that some of the additional allegations were based on documents available to plaintiff when the original complaint was filed.

After five days of trial, the district court found in favor of Union Oil on all points. The court found that thirteen of the exceedances were not even actual exceedances "because the applicable permit limitation either was not exceeded, or because the result was caused by error in wastewater sampling or analysis." Findings of Fact and Conclusions of Law ("Memorandum") at 8. The court found that fifty of the exceedances were excusable under an upset defense. *Id.* at 8, 10. Finally, it found that "a few exceedances (minor in magnitude) [presumably the thirteen remaining exceedances] were caused by very unusual human errors that are excusable in light of time span and number of acceptable readings." *Id.* at 9–10. Sierra Club brought a timely appeal.

## ANALYSIS

### I. *Upset Defense*

We hold that the district court erred in allowing Union Oil to raise the upset defense in this enforcement proceeding. Moreover, the district court misapplied the upset defense as codified in 40 C.F.R. § 122.41(n).

### A. *Union Oil's Qualifications to Assert the Defense*

#### 1. *Federal Law*

The issue whether Union Oil was entitled under the Act to raise the upset defense involves interpretation of federal law. The district court's findings on this issue are therefore reviewable de novo. *See, e.g., Trustees of Amalgamated Insurance Fund v. Geltman Industries,* 784 F.2d 926, 929 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986).

The district court found that Union Oil was entitled to assert the upset defense under *Marathon Oil,* 564 F.2d at 1253, 1272–73, and under 40 C.F.R. § 122.41. We disagree.

This is an enforcement action in which Sierra Club alleged that Union Oil failed to comply with the terms of a permit issued by the California Water Board. Union Oil was essentially asking the district court to modify its permit to include an upset provision. This the district court was not entitled to do. To obtain modification of its permit, Union Oil should have acted through the proper administrative channels. Because Union Oil failed to exhaust its administrative remedies, it is bound by the terms of the permit issued by the California Water Board.

██ A party must exhaust its administrative remedies before it can obtain judicial review of an agency decision. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). The purpose of the exhaustion rule is "to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815,

---

**3.** Sierra Club argued during the hearing on its motion to amend that no statute of limitations applied to Federal Water Pollution Control Act causes of action. The district court rejected this notion, and Sierra Club has not renewed the argument on appeal.

817, 31 L.Ed.2d 17 (1972). At the time the permit was issued and reissued, Union Oil had several administrative routes that it could have taken to protest the permit's terms. The NPDES program authorizes permittees to seek modifications of their permits in response to current judicial decisions and new EPA regulations. 40 C.F.R. § 122.62. In addition, when a state permit issuer submits a proposed permit to the EPA Administrator for review, the Administrator is authorized to object to the permit's terms. 33 U.S.C. § 1342(d). Review of the Administrator's actions may be had in the appropriate circuit court of appeals. 33 U.S.C. § 1369(b)(1). The Act further provides that "[a]ction of the Administrator with respect to which review could have been obtained under paragraph (1) of this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement." [4] 33 U.S.C. § 1369(b)(2).

■ Union Oil failed to seek any type of administrative review of its permit's terms since its appeal of the original permit in 1974. If Union Oil desired modification of its permit in the wake of *Marathon Oil* or the adoption of 40 C.F.R. § 122.41, it should have petitioned the California Water Board for review of the permit. When the EPA Administrator failed to object to the permit's terms, Union Oil should have appealed from that decision. Union Oil failed to follow the administrative steps that would have allowed the issuing agency to address Union Oil's claims. Union Oil only initiated criticism of its permit in an enforcement action before the district court. Therefore, Union Oil failed to exhaust its administrative remedies and was precluded from raising the upset defense in the district court.

Union Oil argues that the doctrine of exhaustion of administrative remedies does not apply here because the upset defense was available to Union Oil under *Marathon Oil* and 40 C.F.R. § 122.41. The upset defense is not, however, an implicit element of Union Oil's permit under *Marathon Oil* or 40 C.F.R. § 122.41. *Marathon Oil* stated that the absence of an upset defense from a *federally* issued permit violated the Federal Water Pollution Control Act. *Marathon Oil*, 564 F.2d at 1272–73. Therefore, when the EPA itself issues a permit, it must, under *Marathon Oil*, include an upset defense.[5] In this case, however, a state agency, not the EPA, issued the permit. The Act explicitly allows states to substitute federal effluent limitations and standards with more stringent state limitations and standards. 33 U.S.C. § 1370. The state's denial of the upset defense is an example of a state imposing standards more stringent than the correlative federal standards. Therefore, the absence of the upset defense in Union Oil's permit does not violate the Federal Water Pollution Control Act, and *Marathon Oil* does not mandate its presence in the permit.[6]

The EPA's regulations promulgated under the Act likewise do not provide Union Oil with an automatic upset defense. 40 C.F.R. § 122.41 states that the upset defense must be incorporated into the permit either expressly or by reference to the relevant C.F.R. sections. Because Union Oil's permit contains neither an express incorporation nor an incorporation by reference,

---

**4.** Marathon Oil Company in *Marathon Oil*, 564 F.2d at 1253, followed the administrative procedure as mandated. In that case, this court reviewed the Administrator's decision to exclude the upset defense from a permit. *Id.* at 1259.

**5.** We make no determination as to whether *Marathon Oil* applies only to technology-based permit exceedances or to both water quality-based and technology-based exceedances. In addition, we do not intend to imply that an enforcement action is ever the appropriate forum for challenging the terms of an NPDES permit.

**6.** *Marathon Oil*'s principal point on this subject is that once a discharger employs the best practicable technology, it is unreasonable to require 100% compliance with the effluent limitations described in the permit. However, the Act entitles the states to select the standards that dischargers must achieve, 33 U.S.C. § 1370. The language of the Act indicates that striving for the utter abolition of pollution is an acceptable approach for states to take. The Act states as one of its objectives the elimination of discharge of pollutants by 1985. 33 U.S.C. § 1251(a)(1). It also recognizes the primary rights and responsibilities of states "to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b).

the defense is not a part of the permit. In addition, while the EPA under this section must include the upset defense in all permits it issues, the regulations explicitly provide that states may omit upset defenses from permits. 40 C.F.R. § 123.25(a).

#### 2. *California law*

█ Union Oil contends that even if federal law does not mandate the inclusion of an upset defense, California law does. Because this question involves the interpretation of state and federal law, we review the district court's determinations de novo. *In re McLinn,* 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc) (state law); *Trustees of Amalgamated Insurance Fund,* 784 F.2d at 929 (federal law).

Union Oil argues that the California Water Board was not permitted under California law to omit the upset defense from a permit unless it made proper findings of necessity for doing so. Again, Union Oil is improperly making this argument during an enforcement proceeding. Union Oil should have pursued its administrative remedies before the state agency and the EPA. Union Oil's failure to exhaust its administrative remedies bars it from criticizing the permit's terms in this action. Union Oil argues, however, that under California law, the upset defense is an automatic element of Union Oil's permit.

California Water Code § 13377 (West Supp.1987) provides:

[T]he state board or the regional boards shall, as required or authorized by the Federal Water Pollution Control Act, as amended, issue waste discharge requirements ... which apply and ensure compliance with all applicable provisions of the act and acts amendatory thereof or supplementary, thereto, together with any more stringent effluent standards or limitations necessary to implement water

quality control plans, or for the protection of beneficial uses, or to prevent nuisance.

Union Oil argues: (1) that the California Water Board violated this law by issuing a permit without an upset defense when it failed to make findings of the necessity of this more stringent standard, (2) that when a state fails to pass a more stringent standard, the federal standard governs, and (3) that the governing federal standard is 40 C.F.R. § 122.41(n), which provides an upset defense. Thus, Union asserts that the federal upset defense regulation applies to Union Oil's permit.

Union Oil's argument is incorrect. California Water Code § 13377 governs the state agency's setting of standards,[7] but the fact that the agency may not have complied with the statute does not implicitly insert an upset provision into Union Oil's permit. The state's method of adopting a more stringent standard should be subject to scrutiny only at the permit issuance stage. Moreover, even if the federal upset regulation did apply, it would not require that an upset defense be inserted into Union Oil's permit because 40 C.F.R. § 122.41 requires that the defense be inserted either explicitly or by reference to the relevant regulations, neither of which occurred here.

We hold that Union Oil was not entitled to use the upset defense to excuse any of the exceedances of its NPDES permit limitations.

#### B. *District Court's Application of the Upset Defense*

The district court misapplied the upset defense to Union Oil's alleged permit violations. The upset defense, as codified at 40 C.F.R. § 122.41(n), protects a permittee from liability only when the permittee proves that highly unusual circumstances

---

7. The statute as written does not, as Union Oil argues, necessarily require "findings" by the state showing its more stringent standards to be necessary.

*See* Appellee's Brief at 41. In the case cited by Union Oil, *Southern California Edison Co. v. State Water Resources Control Board,* 116 Cal. App.3d 751, 172 Cal.Rptr. 306 (1981), the California Water Board set limitations that were more restrictive than those contained in California's own Ocean Plan. *Id.* at 758–59, 172 Cal. Rptr. at 310. *Southern California Edison* does not address the situation in which a California permit applies standards more stringent than the federal Act but in keeping with California law, and thus does not govern this case.

made preventing pollution difficult. The regulation imposes numerous stringent requirements, both substantive and procedural, that must be satisfied before a court may allow use of the upset defense.

The district court found in the broadest terms that all of Union Oil's permit violations were excusable on upset defense and other grounds. The court applied the upset defense, as codified at 40 C.F.R. § 122.-41(n), only in adopting its definition of "upset" as "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee." 40 C.F.R. § 122.41(n). The district court ignored both substantive and procedural requirements for application of the upset defense. The court's interpretations of the regulation are conclusions of law that are reviewable de novo. *Trustees of Amalgamated Insurance Fund,* 784 F.2d at 929. The district court's finding of fact are reviewable on a clearly erroneous basis. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

### 1. *Substantive Deficiencies*

### a. *Water Quality-Based Exceedances*

■ The district court erred in applying the upset defense to exceedances of water quality-based permit limitations. The EPA regulation permits use of the upset defense only with respect to *technology-based* permit exceedances. 40 C.F.R. § 122.41(n)(1).

The federal Administrator and state boards may, under the Act, impose water quality-based standards or technology-based standards.[8] The federal government establishes technology-based effluent standards based on polluters' technological and economic ability to control effluent levels. Technology-based limitations require application of the best practicable control technology currently available, as defined by the Administrator. *See* 33 U.S.C. § 1311(b)(1)(A). These limitations require

that each permittee within a given industrial subcategory restrict its effluent levels to certain numerical amounts.

States establish water quality standards that specify the uses to be made of a body of water and the maximum levels of pollutants allowable in view of those uses. Water quality standards are designed to ensure the survival of wildlife in navigable waters and to protect recreational activities in and on the water. 33 U.S.C. § 1312(a). In contrast with technology-based standards, which are based on the feasibility of limiting effluent levels, water quality-based limitations relate to the environmental effects of different effluent levels.

While the EPA considered applying the upset defense to water quality-based exceedances, *see* 47 Fed.Reg. 52,079 (1982), it later rejected this application as impractical:

> [I]t is apparent that it is not practical to extend the upset defense to violations of water quality-based limitations. Failures of pollution control equipment can occur on water quality limited stream segments. However, water quality standards are established to protect uses of the water, and are legally required to be met at all times.... Any defense for upsets must ensure that water quality standards are achieved at all times throughout the upset.... [and] would require a showing that water quality standards continued to be achieved in all stream segments, and for all pollutants, potentially affected by the discharge.
>
> ....
>
> Since it would be almost impossible for a permittee to establish the upset defense, the proposed extension [to water quality-based limitations] would be illusory....

49 Fed.Reg. 38,038 (1984).

The record indicates that at least twenty-two of the permit violations were water quality-based, involving visible oil on San Pablo Bay, settleable solids, and coliform violations. The district court erred in holding that the upset defense as provided in 40

---

**8.** For an enlightening discussion of technology-based and water quality-based permit limitations, see Gaba, *Federal Supervision of State*  *Water Quality Standards Under the Clean Water Act,* 36 Vand.L.Rev. 1167 (1983).

C.F.R. § 122.41 excused these violations of the permit's water quality-based limitations.

#### b. *Operator Error*

■ The district court stated that "a few exceedances (minor in magnitude), during the five-year period at issue, were caused by very unusual human errors that are excusable in light of time span and number of acceptable readings." Memorandum at 9–10. The court does not make clear whether it makes this analysis under the upset defense provision. If the analysis was based upon the upset defense, it was clear error. The upset provision clearly states that noncompliance caused by operational error is not an upset. 40 C.F.R. § 122.41(n). We conclude below that these exceedances were not excusable on any other grounds.

#### c. *Inadequate Facilities*

The upset provision does not apply to noncompliance caused by improperly designed or inadequate treatment facilities. 40 C.F.R. § 122.41(n)(1). The record indicates that Union Oil's facilities were not adequate to handle heavy rainfall. Union Oil's supervisor of environmental control engineering stated in his declaration in support of Union Oil's motion for summary judgment that the capacity of Union Oil's storm basins is "generally sufficient to contain the excess wastewater occurring during any storm of a magnitude which is expected to occur on the average of once every ten years." Declaration of Donald W. DeBuse in Support of Union Oil Company of California Motion For Summary Judgment at 8. If the plant was only designed to handle rains of a magnitude occurring every ten years, the statistical chance is very high that unusual rains will cause exceedances of permit limitations over the life of the plant.

The inadequacy of Union Oil's facilities in this case is underlined by the fact that Union Oil's permit also adjusts upwardly the limitations for periods of heavy rainfall. Union Oil's pollution during the winters of 1981 and 1982 exceeded even the limitations reflecting this upward adjustment. By providing this stormwater runoff ad-justment, which varies according to amounts of rainfall, the California Water Board was indicating what levels of pollution should occur in a properly designed and adequate plant when heavy rains take place. A plant like Union Oil's that is incapable of adhering even to these adjusted limitations is inadequate. On the basis of inadequate equipment alone, all of the violations attributed by Union Oil to heavy rain should not have been excused on the upset defense ground.

#### 2. *Procedural Deficiencies*

■ The district court made no findings as to whether Union Oil complied with the procedural requirements for showing an upset. A permittee who wishes to raise the defense of upset must show:

(1) that an upset occurred and that the permittee can show the cause;

(2) that the facility was properly run at the time of the upset;

(3) that the permittee provided the proper notice of the upset;

(4) that the permittee conformed with remedial requirements.

40 C.F.R. § 122.41(n)(3). In addition, the burden of proof is on the permittee to show compliance with these requirements. 40 C.F.R. § 122.41(n)(4).

The district court applied none of these procedural rules. It did not place the burden of proof on Union Oil for use of the defense. While the record contains evidence that Union Oil failed to identify causes for several violations and provided insufficient notice in some cases, the district court held that the upset defense excused Union Oil in all cases. Failure to require that the permittee satisfy all of the procedural requirements specified in 40 C.F.R. § 122.41(n)(3) is improper.

The district court's failure properly to apply the upset defense regulation in itself justifies reversal of its finding of no liability as to the allegedly rainfall-related exceedances.

### II. *De Minimus Theory*

■ The district court's application of a purported de minimus exception to the Clean Water Act raises an issue of statu-

tory interpretation and is reviewable de novo. *See, e.g., Trustees of Amalgamated Insurance Fund,* 784 F.2d at 929.

As noted above, the district court excused "a few" of the exceedances on the ground that they "were caused by very unusual human errors that are excusable in light of time span and number of acceptable readings." It is unclear whether the court intended to excuse these violations under the upset defense or under a de minimus theory. In either event, the district court erred. The Clean Water Act and the regulations promulgated under it make no provision for "rare" violations. Our legal system would be quite different if one's behavior were evaluated using the aggregative method the district court applied.

### III. *Sampling Error Defense*

The district court's findings that reported violations were excusable as based on sampling errors is a question of statutory interpretation, reviewable de novo. *See, e.g., Trustees of Amalgamated Insurance Fund,* 784 F.2d at 929. The district court's finding that some of the alleged violations were not actual violations is a finding of fact, reviewable under the clearly erroneous standard. *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948).

The district court's opinion states:

Of those alleged ... violations, Union Oil presented evidence that thirteen were not even actual exceedances of permit limitations, because the applicable permit limitation either was not exceeded, or because the result was caused by error in wastewater sampling or analysis.

Memorandum at 8.

The court made no explicit finding on Union Oil's contention that thirteen of the alleged exceedances either were not exceedances or were caused by sampling error. We must surmise from the court's excusing Union Oil on all of the alleged violations that the court found that in the cases of these thirteen alleged violations either Union Oil had not violated the permit's terms or the exceedances were excusable due to sampling error.

Of the thirteen alleged violations in question, Union Oil presented some evidence that six were not in fact exceedances of the limitations set out in the permit. Two of the thirteen alleged violations are allegations of biochemical oxygen demand and oil and grease violations in February 1983 and December 1981, respectively. Because the district court made no finding as to whether these two alleged permit violations were in fact permit violations, we remand for the purpose of allowing the district court to make a finding of fact on this point.

■ The district court also failed to make findings of fact as to Union Oil's denial that in four instances it violated the permit's prohibition against creating conditions of visible oil in the receiving waters. It is unnecessary to remand this question because the record shows as a matter of law that Union Oil did violate the visible oil limitation. Union Oil argued at trial that while visible oil had been observed on the water near one of Union Oil's monitoring stations, there was no evidence of visible oil on San Pablo Bay. But Union Oil's permit limitations applied to "the waters of the state," not merely to San Pablo Bay. Thus, the four alleged visible oil violations were in fact chargeable to Union Oil.

■ Union Oil argued that seven of the alleged violations were excusable because, while the Discharge Monitoring Reports ostensibly indicated that Union Oil had exceeded limitations contained in the permit, these reports were invalid due to sampling error. We hold that the district court should not have excused these exceedances on the basis of sampling error.

The NPDES program fundamentally relies on self-monitoring. The Code of Federal Regulations contains several provisions that are obviously designed to ensure utmost accuracy in the reports submitted by permittees. For instance, 40 C.F.R. § 122.-22 requires that a person signing a self-monitoring report shall make the following certification:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly

gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

The regulations at 40 C.F.R. §§ 122.41(j) and (k) establish numerous requirements for self-monitoring and reporting. These sections provide for heavy criminal penalties for anyone who knowingly falsifies reports or knowingly makes any false statement.

These and other EPA regulations demonstrate the agency's concern that reports be accurate. The legislative history surrounding the 1972 amendments to the Act supports the conclusion that accurate reports are critical to effective operation of the Act:

> [T]he bill ... establishes and makes precise new requirements imposed on persons and subject to enforcement. One purpose of these new requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements under this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.

S.Rep. No. 414, 92nd Cong., 1st Sess. 64, *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3730.

Were we to accept Union Oil's argument regarding the use of sampling errors to excuse reported permit exceedances, we would be sanctioning countless additional hours of NPDES litigation and creating new, complicated factual questions for district courts to resolve. As indicated by the legislative history, Congress hoped to limit such situations. In addition, if each self-monitoring report is to be considered only prima facie rather than conclusive evidence of an exceedance of a permit limitation, citizen groups like the Sierra Club would be taking a considerable risk whenever they initiated a citizen enforcement action pursuant to 33 U.S.C. § 1365. While a permittee's publicly filed reports might clearly indicate that illegal pollution was taking place, the permittee might have additional information unavailable to citizen groups indicating that sampling error rendered the reports meaningless. Finally and most importantly, allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices. Such an approach would surely undermine the efficacy of the self-monitoring program.

We conclude that when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error.

### IV. *Amendment of Complaint*

This court applies an abuse of discretion standard of review to district court decisions to deny leave to amend a complaint after a pleading responsive to the original complaint has been served. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Klamath-Lake Pharmaceutical Association v. Klamath Medical Service Bureau*, 701 F.2d 1276, 1292 (9th Cir.), *cert. denied*, 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

Sierra Club's proposed amended complaint alleged additional permit violations falling into three categories: (1) reported violations occurring after March 30, 1979, (2) reported violations occurring before March 30, 1979, and (3) unreported violations. The district court denied Sierra Club's motion for leave to file the amended complaint. Sierra Club now seeks reversal of the district court's denial of leave to amend, except with respect to those violations in category (2), reported violations occurring before March 30, 1979.

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." This court in *Howey v. United States*, 481 F.2d 1187, 1190 (1973) stated:

> The purpose of pleading is "to facilitate a proper decision on the merits," *Conley v.*

*Gibson,* 355 U.S. 41, 48 [78 S.Ct. 99, 103, 2 L.Ed.2d 80], ... (1957), and not to erect formal and burdensome impediments in the litigation process. Unless undue prejudice to the opposing party will result, a trial judge should ordinarily permit a party to amend its complaint.

■ The district court held that Sierra Club was barred by the five-year statute of limitations, 28 U.S.C. § 2462, from prosecuting claims based on violations occurring before June 30, 1979, and that therefore amendments describing those violations, even the unreported ones, would be futile. *See* Order Denying Plaintiff's Motions For Summary Judgment, For Leave to File an Amended Complaint, and for Reconsideration of Magistrate's Order Denying Further Discovery at 8. As to the unreported violations occurring after March 30, 1979, there is no statute of limitations problem. As to the unreported violations occurring before March 30, 1979, Sierra Club contends that (a) as claimant in this case, it did not learn of these violations until after the original complaint was filed, and (b) Union Oil committed fraud in concealing the violations. Because Sierra Club has raised pertinent questions of fact for the district court on whether the statute of limitations has been tolled (issues that the district court did not address in its memorandum supporting denial of the amendments), the district court is incorrect in peremptorily deeming amendments pertaining to the unreported pre-March 1979 violations to be futile.

In addition to citing the statute of limitations bar as justification for denying leave to amend, the district court denied amendment of the entire complaint because Sierra Club had access to information concerning some of the newly alleged violations when it filed the original complaint and because of delay and prejudice.

■ Because Sierra Club knew or should have known when it filed the original complaint of five of the new violations alleged in the amended complaint, it was properly denied amendment with respect to those violations. We have held that where the party seeking amendment knows or should know of the facts underlying the amendment when the original complaint is filed, the motion to amend may be denied. *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1324 (9th Cir.), *vacated on other grounds,* 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982). As to the rest of the complaint here, however, the district court had no basis under the law of this circuit to deny the amendment.

■ Mere delay in proffering an amendment does not justify denying leave to amend. *Howey,* 481 F.2d at 1190–91. This court has also held that where a defendant is on notice of the facts contained in an amendment to a complaint, there is no serious prejudice to defendant in allowing the amendment. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1053 n. 68 (9th Cir. 1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982); *see also Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 644 F.2d 690, 694 (8th Cir.1981). Here, where all of the amendments were based upon facts contained in Union Oil's own records, Union Oil had notice of the facts. Thus, there is no prejudice to Union Oil.

*Howey* also provides: "Where there is a lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an abuse of discretion to deny such a motion." *Howey,* 481 F.2d at 1190–91. Here, Union Oil has not asserted, nor has the district court found, that the amendment was frivolous or made in bad faith. General considerations of judicial economy also justify allowing the amendments. The violations included in the proposed amendment relate to the same subject matter as the original complaint. Allowing the amendment will further the federal policy of "wrapping in one bundle all matters concerning the same subject matter." *Rosenberg Bros. v. Arnold,* 283 F.2d 406 (9th Cir.1960) (per curiam). For all of these reasons, we reverse the district court's denial of Sierra Club's motion for leave to amend. Sierra Club should be allowed to amend to include all violations except for the five about which it knew or should have known when it filed the original complaint.

## CONCLUSION

We remand to the district court for the purpose of determining whether the alleged February 1983 biochemical oxygen demand violation and the alleged December 1981 oil and grease violation in fact occurred. The district court's finding of no liability for the other seventy-four exceedances alleged in the original complaint is reversed and the case is remanded for determination of penalty. The district court's denial of leave to amend the complaint is reversed, except as to violations about which Sierra Club knew or should have known when it filed the original complaint.

Affirmed in part; reversed in part; and remanded. Appellant is entitled to costs.