**CHESAPEAKE BAY FOUNDATION, INC., et al., Plaintiffs,**

v.

**VIRGINIA STATE WATER CONTROL BOARD et al., Defendants.**

Civ. A. No. 77–0376–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Oct. 9, 1980.

Patrick M. McSweeney, McSweeney, Stutts & Burtch, Richmond, Va., Bruce J. Terris, Washington, D. C., Betty C. Higginbotham, Staff Atty., Annapolis, Md., for plaintiffs.

Norman Olitsky, Portsmouth, Va., Steven Lieberman, City Atty., Stuart E. Katz, Asst. City Atty., Portsmouth, Va., for intervening defendants.

Frederick S. Fisher, Asst. Atty. Gen., Richmond, Va., Gerald L. Baliles, Richmond, Va., J. Michael Hines, Dow, Lohnes & Albertson, and John Feore, Washington, D. C., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This action was originally brought by two environmentally concerned groups active in the Chesapeake Bay area, the Chesapeake Bay Foundation, Inc. and Citizens Against the Refinery's Effects, Inc. (CARE), who oppose the issuance of a National Pollutant Discharge Elimination System (NPDES) permit under § 402 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1342, for the construction of a refinery by the Hampton Roads Energy Co., Inc. (HERC). Original defendants in this action were the Virginia State Water Control Board (the State Board), the United States Environmental Protection Agency (EPA) and its Administrator, and HREC. Having already reconsidered its own judgment once, the Court entered final judgment in favor of defendants on July 29, 1980.[1] That judgment reflected the Court's conclusion that no federal cause of action existed for

---

1. In *Chesapeake Bay Foundation, Inc. v. United States*, 445 F.Supp. 1349 (E.D.Va.1978), this Court dismissed plaintiffs' Claims II–IV for lack of subject matter jurisdiction. In *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board*, 453 F.Supp. 122 (E.D.Va. 1978), the Court dismissed plaintiffs' remaining claims, but vacated its earlier dismissal of Claims II–IV.

plaintiffs to assert their then–remaining claims. Plaintiffs have now moved to amend the judgment pursuant to Fed.R. Civ.P. 59. Additionally, plaintiffs seek leave to amend the complaint. The remaining defendants, the State Board and HREC, have submitted memoranda in opposition thereto.

Plaintiffs base their motion to amend the judgment on three grounds. They contend that the Court's July 29, 1980 memorandum is internally inconsistent, that the Court failed to adequately distinguish, or give proper consideration to, *National Sea Clammers Association v. City of New York*, 616 F.2d 1222 (3d Cir. 1980), and lastly, that the judgment is inconsistent with the recent decision in *Maine v. Thiboutot*, —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

Plaintiffs would amend the complaint in two important respects. First, plaintiffs would now join Mr. Alton Wright, Chairman of the State Board, as a defendant. Second, plaintiffs would allege 42 U.S.C. § 1983 as the basis for their cause of action.

A. *Plaintiffs' Motion to Amend the Judgment*

The Court's July 29, 1980 memorandum addressed the issue as to whether the complaint presented a substantial federal question upon which jurisdiction could be premised pursuant to 28 U.S.C. § 1331. Defendants had previously asserted that the only federal question, or "minimum federal guarantee," relevant to this action arose from the qualification requirements of the NPDES program. The Court rejected this contention, and concluded that a federal question was raised by the claim that the State Board's administration of its NPDES program did not conform to the requirements of the FWPCA.

The Court next considered whether a federal cause of action existed to support the plaintiffs' challenges in the instant case. The Court determined that the requisite cause of action was not created, either explicitly or implicitly, by the Act. Plaintiffs now contend that the Court's analysis with respect to the jurisdiction issue is inconsist-

ent with the cause of action reasoning. The Court disagrees.

Jurisdiction, of course, refers to the Court's power to entertain a controversy. As summarized *supra*, the Court determined that it was vested with the authority to render a decision in this matter. Plaintiffs' instant contentions, however, seem to ignore the fact that jurisdiction is a concept quite apart from the issue of whether the plaintiffs have a cause of action to assert. In the Court's opinion, the two issues are distinct and there was thus no inconsistency in the Court's memorandum.

Plaintiffs next contend that the Court did not adequately distinguish *National Sea Clammers*, 616 F.2d 1222, contending that *National Sea Clammers* is persuasive, if not dispositive of the case at bar. The Court, however, remains of the view that *National Sea Clammers* is distinguishable for the reasons stated in the July 29, 1980 memorandum. In the Court's view, *District of Columbia v. Schramm*, 631 F.2d 854 (D.C. Cir.1980), addressed the issues presented in the instant case in a more analagous context. The Court considered and addressed plaintiffs' contentions with regard to *National Sea Clammers* prior to entering judgment and those contentions need not be discussed on this occasion.

Additionally, plaintiffs contend that the judgment is inconsistent with *Thiboutot*, -- U.S. -- --, 100 S.Ct. 2502, 65 L.Ed.2d 555. That case held that 42 U.S.C. § 1983 may provide a cause of action for claims based on a violation of any federal statute. As plaintiffs admit, their motion to amend the judgment to be more in accord with *Thiboutot* is dependent upon the success of their motion to amend the complaint. Plaintiffs did not originally allege deprivation of any rights secured under 42 U.S.C. § 1983. Moreover, even if plaintiffs had made such an allegation, the original defendants to this suit were either not parties against which § 1983 creates a cause of action, or were immune to suit in this court under the Eleventh Amendment. As a result, plaintiffs now seek leave to amend the complaint to make use of § 1983's remedial

provisions, and to add Mr. Wright, Chairman of the State Board, as a party defendant.[2] In this manner, plaintiffs propose to continue their effort to secure an injunction against the State Board's issuance of an NPDES permit to HREC.

### B. Plaintiffs' Motion to Amend the Complaint

 Amendment at this time requires leave of the Court which "shall be freely given when justice so requires." Fed.R. Civ.P. 15(a). Although this is a matter entrusted to the sound discretion of the trial court, leave may not be arbitrarily denied. *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Plaintiffs may be granted leave to amend the complaint even after judgment has been entered for the defendants. *Id.* at 182, 83 S.Ct. at 230. If, though, the Court is of the opinion that that amendment would be futile, a sound basis exists for denying plaintiffs' motion. *Id.* Thus, as plaintiffs recognize, their motion to amend the complaint must in its turn stand or fall in accordance with the Court's determination of the applicability of § 1983 to the violation of the FWPCA alleged here.

Admittedly, had the amendment proposed here been brought only a few years ago, plaintiffs' reliance on § 1983 would have seemed far more tenuous than it presently does. Title 42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution *and laws,* shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. (Emphasis added.)

Until *Thiboutot,* it remained unclear whether the "laws" referred to in § 1983 included all laws of the United States, or only those laws falling within the qualifying language of 28 U.S.C. § 1343(3), § 1983's jurisdictional statute—*i. e.,* only those Acts of Congress "providing for equal rights of citizens or of all persons within the jurisdiction of the United States." *See, e. g., Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 616, 99 S.Ct. 1905, 1913, 60 L.Ed.2d 508 (1979); *Id.* at 622–23, 99 S.Ct. at 1916 (Powell, J., concurring). *Thiboutot* has resolved that question unequivocally: the word "laws" as it appears in § 1983 may be taken to mean any law, and not merely statutes · that promote equal protection.[3] Thus it is plaintiffs' contention that § 1983 provides them with the cause of action they previously lacked.

In response to plaintiffs' contentions, defendants suggest several reasons why § 1983 should not affect the judgment already entered in the instant case. First, certain defendants contend that the Virginia statute of limitations bars any action against Wright. Second, defendants argue that § 1983, even after *Thiboutot,* provides a remedy only for the deprivation of strictly personal rights and benefits such as Social Security entitlements. Finally, defendants suggest that the remedies already contained in the FWPCA were intended by Congress to preclude reliance on § 1983 here. Although the Court finds the first two of defendants' contentions unconvincing, the

---

2. It is, of course, well–established that federal courts can, notwithstanding the Eleventh Amendment, entertain suits against a state official who, acting in his official capacity, violates federal law. *Edelman v. Jordan,* 415 U.S. 651, 664–68, 94 S.Ct. 1347, 1356–58, 39 L.Ed.2d 662 (1974); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

3. The position taken by the Supreme Court in *Thiboutot* is, at least in this circuit, not an entirely novel one. The U.S. Court of Appeals for the Fourth Circuit held six years ago that § 1983 might sustain statutorily–based causes of action not related to equal protection. *Blue v. Craig,* 505 F.2d 830, 835-38 (1974). The existence of long–standing precedent within the circuit, which, leaving aside the question of attorney's fees, appears fully as broad as *Thiboutot,* raises a question as to why the Court should at this late date entertain a motion to amend the complaint. Nevertheless, the Court has resolved to give its fullest consideration to the new issues raised by plaintiffs.

Court has concluded that in light of the current administrative posture of the case, the Act, taken as a whole, demands that defendants' final argument be accepted.

### 1. Statute of Limitations

■ Congress has not enacted a statute of limitations for claims arising under § 1983. Accordingly, the Court must follow the most appropriate state statute. *Almond v. Kent*, 459 F.2d 200, 203 (4th Cir. 1972). The permit in question here was issued in February, 1977. Thus, approximately three and one-half years have passed since the action by the State Board. If the Virginia statute's two year limitation on actions for personal injuries applied here, then the current motion to amend might in fact be time-barred. *See* Va.Code Ann. § 8.01-243.A (1977 replacement vol.) [4] The present action, though seems to have as its focus not relief from injury to the plaintiffs' persons, but to their property,[5] and thus is subject to a five-year limitation under Virginia law. *See id.* at § 8.01-243.-B. As this circuit held some time ago, "[u]nder Virginia law, it is the object of litigation which determines the applicability of a statute of limitations not the form in which the suit is instituted." *Almond v. Kent*, 459 F.2d at 204. Thus, the Court must squarely face plaintiffs' contention that 42 U.S.C. § 1983 creates a cause of action under the FWPCA.

### 2. Personal Benefits and Entitlements

■ Both *Thiboutot* and *Blue v. Craig*, 505 F.2d 830 (4th Cir. 1974),[6] dealt with a cause of action alleging deprivation of rights provided by the Social Security Act, 42 U.S.C. §§ 301-1397. Narrowly construing those cases, defendants' argument that § 1983 should provide a remedy only in actions brought to preserve strictly personal rights and entitlements (assuming such a distinction can be made) does, indeed, have some force. The Supreme Court's reasoning in *Thiboutot*, though, appears unrestrained by qualification as to the type of statute for which § 1983 may provide a claim, and provides no hint as to why this Court should construe its language narrowly.[7] Indeed, the language found in *Thiboutot* suggests that the court there gave great weight to "the plain language of the statute," which obviously does not limit the section to any special subset of laws. *See*, —- U.S. at ——, 100 S.Ct. at 2505. The plain implication of the Supreme Court's holding is that § 1983 may provide a cause of action to protect "any rights . . . secured by the . . . laws . . . .", *i. e.*, to protect any right secured by any (federal) law. At the very least, this Court holds that the section may, absent other constraints, provide protection for rights secured by the FWPCA.

### 3. Exclusive Remedies

■ Because the question of how § 1983 should be used to implement the FWPCA is, as far as the Court can determine, one of first impression, the Court has endeavored to use extreme care in considering both the relationship of *Thiboutot* to existing law, and the relationship of plaintiffs' complaint to the Act as a whole. Although the language of *Thiboutot* itself is open-ended, the Supreme Court has in other contexts held that the section does not reach all statutes covered by the "literal applicability of its

---

**4.** The Court's decision *infra* to apply a five-year limitation in the present case makes it unnecessary to decide whether issuance of an NPDES permit constitutes an on-going action under the statute.

**5.** *E. g.*, plaintiffs' complaint alleges in part: [Chesapeake Bay Foundation, Inc.] owns property bordering the Bay and its members use and enjoy all parts of the Bay and all parts of the tributaries for fishing, swimming, boating and other purposes. The interests of the Foundation and its members will be in-

jured or adversely affected by the degradation of water quality in the Bay. . . .
Complaint at paragraph 3.
The complaint contains similar allegations regarding plaintiff CARE, Inc. *Id.* at paragraph 4.

**6.** *See* note 3, *supra*.

**7.** Justice Powell, in dissent, suggested that after *Thiboutot*, § 1983 no longer *can* be construed as narrowly as defendants would have this Court construe it. *Thiboutot v. Maine*, —— U.S. at ——, ——, 100 S.Ct. at 2510-2519.

terms." *Preiser v. Rodriguez,* 411 U.S. 475, 489, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973). In *Preiser,* the Supreme Court held that even where a prisoner has petitioned for relief from a denial of a Constitutional right that would otherwise be available under § 1983, the existence of federal habeas corpus statutes, 28 U.S.C. §§ 2241, 2254, precludes reliance on § 1983 where the relief sought resembles that traditionally sought in habeas corpus.[8]

Although the basis of the distinctions made by the court in *Preiser* is not entirely clear,[9] it is apparent that both the specificity of the federal habeas corpus statutes, when compared to the general language of § 1983, as well as the former statute's historically–accepted resolution of important concerns of federalism, greatly influenced the court's conclusion that habeas corpus should provide an exclusive federal remedy for the termination of incarceration in state institutions. 411 U.S. at 489–91, 93 S.Ct. at 1836–37.[10] As the Court hereinafter describes in greater detail, the FWPCA prescribes a complex and far-reaching set of procedures and remedies to be used where violations of its sections are alleged. Furthermore, although almost any action brought under § 1983 may present problems

of federalism, *see generally Developments in the Law–Section 1983 and Federalism,* 90 Harv.L.Rev. 1133 (1977), the FWPCA presents such questions with dismaying frequency. The agonizing Congressional struggle to define the proper role of state water control programs under the FWPCA has been recounted elsewhere. *See, e. g., Save the Bay, Inc. v. Administrator,* 556 F.2d 1282, 1285–87 (5th Cir. 1977); *Mianus River Preservation Committee v. Administrator,* 541 F.2d 899, 905–09 (2d Cir. 1976). It should suffice to note that that history, together with the explicit statements found in the Act's declaration of goals and policy,[11] demonstrate that the Act grants primary responsibility for issuing NPDES permits to the states. In light of *Preiser,* all of these factors must be taken, on the most general level, to cast a doubt on the advisability of establishing a cause of action under § 1983 for circumstances already covered by the Act. Final resolution of the instant case, though, requires a more detailed examination of the Act's remedial sections.

Under the Act, it is unlawful for a party to discharge pollutants except, *inter alia,* in compliance with an NPDES permit. *See* FWPCA §§ 301, 402; 33 U.S.C. §§ 1311, 1342. NPDES permits may be issued either

---

8. 411 U.S. at 487–90, 93 S.Ct. at 1835. In *Preiser,* petitioners alleged that they had been deprived of earned good–conduct--time credits without due process of law. Thus, petitioners' allegations on their face presented a classic § 1983 claim. Upon accrual of a given amount of "good time", however, petitioners automatically became entitled to immediate release on parole. By seeking reinstatement of earned "good time" through a § 1983 action petitioners sought to gain all the relief that would have been available to them under the habeas corpus statutes, without having to exhaust their state remedies as the habeas statutes require.

9. *See* 411 U.S. at 506–12, 522--24, 93 S.Ct. at 1852–53. (Brennan, J., dissenting).

10. *Cf. Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 673 n.2, 99 S.Ct. 1905, 1945 n.2, 60 L.Ed.2d 508 (1979), in which Justice Stewart, in dissent, stated:

 ... a similar doctrine may restrict § 1983 suits brought for violations of other federal statutes. When a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement

scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983. For example, a suit alleging that a State has violated Title VII of the Civil Rights Act of 1964 must comply with the procedural requirements of that Act, even though such a suit falls within the language of § 1983.

Justice Stewart was part of the six–member majority in *Thiboutot.*

11. Section 101(b) of the Act, 33 U.S.C. § 1251(b), states:

 It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is the policy of Congress that the States ... implement the permit programs under sections 1342 [NPDES permits] and 1344 of this title.

by the EPA itself, under § 402(a), or, where EPA grants its approval, by the states under § 402(b). In the present case, EPA has approved the Virginia NPDES program.

Where the Administrator determines that a state program *as a whole* is not being administered in accordance with the guidelines required by the FWPCA, he can, and indeed probably must, withdraw his approval of the program unless the state corrects the deficiencies in its program. *See* § 402(c)(3), 33 U.S.C. § 1342(c)(3).[12] Furthermore, the Act specifies that any citizen may commence suit in federal district court where it is alleged that the Administrator has failed to perform any nondiscretionary duty of the sort that § 402(c)(3) arguably creates. FWPCA, § 505(a)(2), 33 U.S.C. § 1365(a)(2). *See also Save the Bay, Inc.*, 556 F.2d at 1289 (specifying procedure for review of state programs leading to judicial review by Court of Appeals.)

As long as a state operates an EPA--approved program, though, obtaining federal judicial review of an *individual* permit decision is more difficult. EPA may veto a permit which it finds incompatible with the Act's requirements, *see* § 402(d)(2), but the agency need not veto a permit, even if that permit arguably violates federal standards, and in fact can waive its right of review entirely. *See* § 402(d)–(e). At least two circuits have now concluded that review of the issuance of a state permit to which EPA has not objected is not itself directly reviewable as an action of the Administrator in the Courts of Appeal under § 509. *Save the Bay, Inc. v. Administrator*, 566 F.2d 1282, 1290–92 (5th Cir. 1977); *Mianus River Preservation Committee v. Administrator*, 541 F.2d 899, 907–09 (2d Cir. 1976). The Act itself makes no explicit provision for

actions against either the state permitting body or the discharger to challenge individual state permits in the district courts, and this Court has already held that no implied cause of action exists under the Act. *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board*, 495 F.Supp. 1229 (E.D.Va.1980). Most recently, this Court, in *Chesapeake Bay Foundation, Inc. v. United States*, has also held that EPA's decision not to object to a permit is, with narrow exceptions, not reviewable in district court. 445 F.Supp. at 1353. *Accord, Save the Bay, Inc.*, 556 F.2d at 1292–96 (dicta).

Plaintiffs contend that precisely because they have no remedy against the EPA under the Act, they should have an opportunity for judicial review of a permit against the State Board, or its Chairman, where a permit allegedly violates the FWPCA. Plaintiffs' contention would seem to be that although under the Act as interpreted in *Save the Bay, Inc., Mianus River*, and *Chesapeake Bay Foundation, Inc.*, EPA cannot be forced to act to account for the validity of all state permits, the states must obey the law regardless of whether EPA has acted to enforce it. Defendants in turn seem to contend that the Act provides sufficient procedural safeguards that the right to federal, judicial review of an individual permit is, as Congress intended it to be, unnecessary or inappropriate.

Before weighing the merits of these arguments, the Court notes that plaintiffs also point to the savings clause of § 505(e) of the Act [13] as dispositive of defendants' contentions. Plaintiff's argument, however, is no more dispositive here than it was at the time of the Court's memorandum of

---

**12.** Section 402(c)(3) states in part:

Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator *shall withdraw approval* of such a program. (Emphasis added).

*See also* § 402(c)(2) (state permit programs shall at all times be in accordance with § 402).

**13.** Section 505(e) states:

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency.)

July 29, 1980 which decided whether plaintiffs could maintain an implicit cause of action under the Act itself. Undoubtedly, if the Court holds that the Act's remedial sections were not intended to be exclusive of other remedies, plaintiffs can maintain their action–with or without the assistance of § 505(e). Just as certainly, if the Court holds that the Act's design specifically excludes federal judicial' review of a state board's action, § 505(e) will save plaintiffs nothing.

The Court finds plaintiffs' position to be subtly but fundamentally mistaken. Crucial to the maintenance of an action under § 1983 is an allegation that the rights and privileges of which plaintiffs are arguably deprived are "secured by the ... laws" of the United States. Here, plaintiffs' ultimate concern over issuance of the permit to HREC is obvious: they fear that discharges from the planned refinery, or the ships it services, will result in further pollution of the Chesapeake Bay. It is their contention that substantive deficiencies in this individual permit, and procedural deficiencies in its issuance, violate the FWPCA. The statutory sections on which plaintiffs have predicated their claim, though, derive almost without exception from the requirements for approval of an entire permitting program, and not from any requirement for the issuance of a single permit.[14] E. g., in Claim II plaintiffs argue that the state has violated the FWPCA by failing to include maximum daily pollutant loads in its permit. According to plaintiffs, this failure should result in revocation of federal approval of the Virginia NPDES program under § 303(e)(2) and § 303(e)(3)(C). The subsections cited by plaintiffs, though, govern EPA's approval of a state's continuing planning process, and not the issuance of individual state permits by the state itself.

Similarly, plaintiffs' Claim III alleges violations of § 402 of the Act, which contains conditions for EPA's approval of state *pro-*

*grams* and not individual permits. Claim IV also alleges violation of § 402, as well as § 101(e) and § 304. The latter section requires that the Administrator of EPA establish guidelines for state NPDES programs. Section 101(e) is part of the Act's declaration of goals and policy, and contains a general statement that the Administrator and the states encourage public participation in the Act's implementation. The only specific action required by § 101(e) is that the states develop and publish regulations specifying minimum guidelines for public participation. Although it appears that Virginia has satisfied this minimum requirement, this Court, in denying the current motion relies on the fact that the Act rests approval of an NPDES program on the more specific requirements of § 402(b)(3).

Plaintiffs' arguments must fail, because the Act itself possesses specific administrative remedies for violation of the sections cited by plaintiffs that are inconsistent with the remedies plaintiffs have proposed. Under the Act, EPA must review the validity of a state NPDES program before a federal court can act. Otherwise, the effect of judicial review would be to deprive a state of the administrative remedies provided by the Act. E. g., § 402(c) requires that EPA provide a public hearing and a written statement of objections before withdrawal of approval of a state program, and a grace period of ninety days during which a state may take action to correct deficiencies in its program. The effect of accepting plaintiffs' arguments would be to negate these requirements. Where it is alleged (as is not the case here) that EPA has improperly failed to withdraw a state's NPDES authority, procedures already outlined by the Court of Appeals for the Fifth Circuit exist should a party wish to challenge EPA's actions. See *Save the Bay, Inc.,* 556 F.2d at 1288-90.[15]

14. It should be noted that in general plaintiffs do not complain that the State Board has directly violated any of the conditions that EPA has imposed on the state permit program, but instead allege that the State Board has violated

conditions that EPA should have, but has not, imposed, or that the Board has violated state laws incorporated into the FWPCA.

15. Those procedures would require that plaintiffs first petition EPA, and then seek relief in

Moreover, only by characterizing alleged violations which would be the responsibility of EPA to correct under the Act as alleged violations of the Act by state officials have plaintiffs maintained their choice of state officials as defendants. This false choice of defendants is generally inconsistent with the Act's other remedies, and cannot be sustained. As noted, the FWPCA contains specific procedures for administrative review of state programs by the EPA. Where the Act does seek to use judicial review to enforce its requirements it provides specific grants of and limits to jurisdiction and causes of action. *See* FWPCA, §§ 505, 509. In light of these distinct policies and trends, it seems inconceivable that Congress intended to create a statute under which EPA, an agency of expertise and enormous technical resources, might *waive* review of *any* individual state permit, but under which a federal court must stand ready to review *every* state permit when it is issued.

Finally, plaintiffs' Claims II and III allege that the HREC permit conditions violate § 301(b) of the Act. That subsection mandates the achievement both of state law requirements, where such requirements are more stringent than those required by the FWPCA directly, and the attainment of federal technology–based requirements by given dates. Plaintiffs contend that Virginia law requires discharge conditions more stringent than those found in the HREC permit.[16] A Virginia court has held otherwise. *See Virginia Oyster Packers and Planters Association v. State Water Control Board*, No. A–609 (Cir.Ct. City of Richmond, Div. I, May 2, 1978). Regardless of that decision, this Court holds that as long as no violation of § 301 has taken place (*i. e.*, as long as no discharges have occurred), that plaintiffs alleged cause of action under § 1983 is not yet ripe. There is nothing anomalous in the present context

about delaying judicial review until the plant beings its actual discharges. The question at issue here is not *whether* the FWPCA will be enforced, but *how* it will be enforced. Indeed, consideration of the results of delay reinforces the inference already accepted by the Court that the Act's remedial sections constitute a carefully tailored whole which cannot indiscriminately accommodate addition. For example, the discretion given EPA to review the issuance of state permits under § 402 disappears in the sections of the Act which govern the actual discharge of pollutants such as §§ 301 02. Should illegally large discharges of pollutants actually occur under the HREC permit, plaintiffs would retain the benefit of the Act's own remedial sections, and, perhaps, extra statutory remedies like those contained in § 1983 as well. In addition, delay until the effect of actual discharges can be monitored seems, at least from a scientific viewpoint, desirable. The substantive issues raised by plaintiffs' complaint involve concerns over the efficacy of the treatment technology HREC proposes to use, and the total quantity of pollutants which the Elizabeth River can absorb without adverse effect. Apparently, there now exists some scientific doubt over how to address these concerns. As a result of this uncertainty, the HREC permit contains monitoring requirements to measure the impact of the plant's impact on the river. If the dispute as to total maximum loads for the river must eventually be resolved by the judiciary, that resolution will be a far more informed one once such data is available.

For the present, no pollutants are being discharged. Moreover, plaintiffs' claims that the permit will result in improper discharges have already been reviewed by the State Board, by the state court that reviewed the Board's decision, and by the

---

the Court of Appeals under § 509 if unsatisfied with the Agency's response. In the present case, it is not clear that plaintiffs ever sought review of the entire Virginia program. Plaintiffs abandoned their claims against federal defendants after this Court held that EPA's deci-

sion not to object to the HREC permit itself was unreviewable.

**16.** Plaintiffs apparently no longer make any claim that the HREC permit fails to meet § 301's technology-based requirements.

EPA. It may be, as plaintiffs insist, that all three of those bodies are mistaken in their estimate of the water quality impact of the HREC permit. If so, however, judicial resolution of that issue will have to wait for the time and remedy provided by law.

In accordance with the discussion above, plaintiffs' motions will be denied.

An appropriate order shall issue.