**NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff,**

v.

**OUTBOARD MARINE CORPORATION, Defendant.**

No. 87 C 4648.

United States District Court, N.D. Illinois, E.D.

Dec. 28, 1988.

---

James F. Simon, Nancy S. Marks, Nora J. Chorover, Natural Resources Defense Council, Inc., New York City, Lee A. Freeman, Jr., Freeman, Freeman & Salzman, P.C., Chicago, Ill., for plaintiff.

Richard J. Kissel, Erica L. Dolgin, Gardner, Caston & Douglas, Chicago, Ill., Sherry L. Holland, Outboard Marine Corp., Waukegan, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Natural Resources Defense Council, Inc. ("NRDC") has sued Outboard Marine Corporation ("OMC") for violations of the statute commonly referred to as the Clean Water Act (the "Act"), 33 U.S.C. §§ 1251–1376.[1] NRDC filed under the Act's "citizen suit" provision (Section 1365) for claimed violations by OMC of its National Pollutant Discharge Elimination System ("NPDES") permit.

This Court's extended July 12, 1988 memorandum opinion and order (the "Opinion," 692 F.Supp. 801[2]) dealt at length with the litigants' contentions. NRDC was wholly successful (even to the point of obtaining summary judgment) except on the issue of OMC's claimed violations involving polychlorinated biphenyls ("PCBs"), which Opinion at 820–21 said had to go to trial.

Now NRDC has returned to the fray with a renewed motion for summary judgment on that remaining isolated issue,[3] failing which NRDC requests a pretrial order clarifying the issues remaining for trial. For the reasons stated in this memorandum opinion and order, this time NRDC's motion for summary judgment is granted.

### NRDC's Second Attempt

In denying NRDC's first effort to obtain judgment on the PCB issue, Opinion at 820

1. In fact, the Act's formal statutory title is the Federal Water Pollution Control Act. All further citations to Act provisions will take the form "Section—," referring to the Title 33 numbering rather than to the Act's internal numbering. Citations to EPA regulations at 40 C.F.R. will be "Reg. § —." Citations to the parties' current set of memoranda will continue the practice, followed in the Opinion referred to in the next paragraph of the text, of using "P." to signify NRDC and "D." to signify OMC—but because this time only the conventional three memoranda are involved, they will be cited simply "Mem." or, as to NRDC's reply, "R. Mem."

2. All citations to the Opinion will read "Opinion at—," omitting the Federal Supplement volume number. This opinion also assumes total familiarity with the Opinion and will therefore (1) employ the same lexicography and (2) eschew any repetition of the facts.

3. NRDC styles that motion as one for partial summary judgment. Though that is an accurate label, to be more precise the motion addresses the sole remaining issue on liability.

found "OMC has demonstrated the existence of a material factual issue as to whether its [PCB] discharges in fact exceeded 1.0 ppb [parts per billion]," the limit imposed in OMC's NPDES permit. That factual issue stemmed from OMC's contention that at the low levels of PCB concentration mandated by its permit, no current monitoring technology could produce reliable results (*id.* at 819–20). NRDC's present renewed motion on the PCB-violation issue is grounded on a contention not previously presented: that the challenged PCB test procedure was a part of the NPDES permit and was therefore not subject to attack in this enforcement proceeding.

Normally summary judgment motions (which are after all substitutes for trial) are much like special promotional offers—one to a customer. But courts do have discretion to consider second efforts at summary judgment, especially where some good reason (such as an expanded record) is shown for departure from the prior denial (*Kirby v. P.R. Mallory & Co.*, 489 F.2d 904, 913 (7th Cir.1973)).

In this instance the Opinion dealt with a wide range of issues, including challenges to this Court's power to hear the case as well as the substantive issues involved. But one question *not* tendered for decision was whether the fact that the PCB test procedure was included as part of the NPDES permit should bar review of that procedure and its results in this Court—an issue not mentioned by either side in any of the five memoranda submitted. Efficient judicial administration compels the examination of NRDC's motion in light of this new material fact.

*Reviewability of OMC's PCB Violations*

Opinion at 820 found a material issue remained as to whether OMC's procedure used to measure PCB levels was "sufficiently accurate for this Court to determine whether OMC has in fact violated its permit." Now NRDC argues the validity of the test procedure does not matter because:

1. OMC's PCB test procedure is prescribed by its NPDES permit.

2. OMC has never challenged that provision of its permit.

3. Review of the test procedure (and hence of the results it has produced) is therefore not available in this Court.

Those propositions will be examined in turn.

1. *OMC's PCB Test Procedure*

■ OMC's NPDES permit requires it to use a particular testing method, known as Method 608, to monitor PCB levels (P.Mem. 6; D.Mem. 6; see Reg. Part 136, App. A, Method 608).[4] Though OMC acknowledges that, it claims it is not challenging the test procedure, but rather "only" the use of its results: It says the Method 608 results cannot be used to monitor the low PCB levels it is mandated to meet.

That attempted distinction cannot be squared with the nature of the NPDES system. One of the vital facets of the Act is its self-reporting structure, under which NPDES permit holders must monitor and report on their own permit compliance (*Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480, 1483 (9th Cir.1987)). Section 1318(a)(4)(A) requires each holder to install, use and maintain monitoring equipment and to sample its effluents. Those sampling results are then reported to EPA and the permit-issuing state agency (*Union Oil*, 813 F.2d at 1483). *Union Oil, id.* at 1491 puts the matter succinctly:

The NPDES program fundamentally relies on self-monitoring.

Thus the purpose of imposing a particular testing method on a permit holder is to use the results of that method to determine liability. It would be a contradiction in terms for a holder, bound to the use of a specified method (which it has not chal-

---

**4.** That requirement is imposed by permit Attachment H, ¶ 10(d):

Monitoring must be conducted according to test procedures approved under 40 CFR Part 136, unless other test procedures have been specified in this permit.

In turn, the cited portion of the CFR specifies Method 608, which was originally available from EPA's Cincinnati laboratories (see Reg. § 136.3, Table I n. 12 (1984)) and was later promulgated formally.

lenged) as the means of monitoring its own effluents, to assert it was somehow not bound by the results of using that method.

OMC may not contend here that the use of its test results is not part and parcel of its NPDES permit. To the contrary, the use of those results is the raison d'etre of specifying Method 608 in the first place.

### 2. Absence of a Challenge to Method 608

Opinion at 810–11 found no action taken by OMC has served to stay the effect of the permit. Though OMC argues that it "has been attempting to have the issuing agency address its claims since 1984" (D.Mem. 9), that contention is really an irrelevancy in current terms. Opinion, *id.* has already made clear that none of OMC's actions operated to suspend the contested terms [5]—but even more importantly, none of those OMC actions targeted Method 608 in any event.

OMC cannot be excused from the duty to exhaust its administrative remedies.[6] It may not argue that its seeking a permit "modification" rather than an appeal, or that its seeking a change in the PCB *limit* rather than in the monitoring *method,* somehow excuses it from challenging the testing method directly. Nothing changes the fact that OMC, in all its battles with the administrative agency, has not disputed the use of Method 608 as such.

### 3. Unavailability of Permit Review in This Court

As the Act is structured, NPDES permits are enforceable by EPA or by a state-cre-ated agency if one exists. Section 1342(b) generally authorizes an individual state to establish and administer its own permit program subject to EPA approval (Reg. § 123.61). State-issued permits are subject to EPA review under Section 1342(d). Those state-issued permits may then be enforced in federal courts pursuant to Sections 1319 (EPA actions) and 1365 (citizen-suit actions).

But those enforcement provisions must be read in conjunction with—and not to vitiate—the exhaustion-of-remedies provisions of Section 1369(b). Those latter provisions are unambiguous where the relevant permit action has been taken by the *federal* agency. Section 1369(b)(1)(F) permits review of an EPA action issuing or denying a permit only in the Circuit Court of Appeals. Section 1369(b)(2) then expressly bars review of an EPA-issued or EPA-denied permit in any District Court enforcement proceeding.[7]

But the applicability of Section 1369(b) to *state*-issued permits that have simply gone unchallenged by EPA stands on a different footing. Although the statutory language does not expressly speak of state-issued permits, *Crown Simpson Pulp Co. v. Costle,* 445 U.S. 193, 196, 100 S.Ct. 1093, 1094, 63 L.Ed.2d 312 (1980) (per curiam) teaches an EPA *rejection* of a state permit *is* subject to direct review in a Court of Appeals under Section 1369(b)(1)(F).[8] In passing *Crown Simpson, id.* at 197 n. 9, 100 S.Ct. at 1095 n. 9 noted that EPA's *failure* to

---

**5.** OMC has apparently reached an agreement with EPA and IEPA on a proposed modified new permit. However, Method 608 still appears to be a part of that new permit, so the significance of that agreement to the issue now under consideration is not readily apparent.

**6.** NRDC has "allowed" in its briefs that it is willing to "create" an exception to the exhaustion requirement of Section 1369 if OMC could not have known of the asserted test flaw in time to challenge it. It is not for a litigant such as NRDC to "create" such an exception for at least two reasons:

    1. Section 1369 deals with subject matter jurisdiction of the federal courts. No litigant (such as NRDC) may enlarge this Court's jurisdiction beyond that specified by Congress.

    2. In any event, Section 1369(b)(1) already contains an exception under which review may be sought after 90 days if grounds for such review "arose" only after the ninetieth day.

**7.** Section 1369(b)(2) reads:

    Action of the Administrator with respect to which review could have been obtained under [Section 1369(b)(1)] shall not be subject to judicial review in any civil or criminal proceeding for enforcement.

**8.** That carries the necessary corollary that such an objection is unreviewable in an enforcement proceeding in the District Court under Section 1369(b)(2).

object to a state-issued permit would probably not be reviewable in that manner. Relatedly, *District of Columbia v. Schramm*, 631 F.2d 854, 860 (D.C.Cir.1980) has concluded that EPA's failure to reject a state-issued permit is not reviewable in the District Court. Thus the thrust of the case law is that Section 1369(b) does not permit review of a non-EPA-objected-to state-issued permit in *any* federal court.[9]

It follows, then, that direct review of EPA-uncontested state-issued permits is confined to state courts. And as might be expected under those circumstances, many states that have NPDES programs have review provisions that parallel Section 1369 (see, e.g., *Chesapeake Bay Foundation v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 443 (D.Md.1985); *Connecticut Fund for the Environment v. Job Plating Co.*, 623 F.Supp. 207, 216 (D.Conn.1985)). Illinois has just such a statute (Ill.Rev.Stat. ch. 111½, ¶ 1041), which sets up a scheme identical to that in Section 1369(b). Illinois too requires exhaustion of administrative remedies, with review of the permit available in a state appellate court (*id.* ¶ 1041(a)) and with a prohibition against such review in any enforcement proceeding (*id.* ¶ 1041(c)).

Such a federal-state division of roles and responsibilities is wholly consistent with the goals of the Act and the NPDES system. Any EPA-issued permit (or any EPA rejection of a state-issued permit) is reviewable in a federal Circuit Court and not in either a federal or state enforcement action. Any IEPA-issued permit (such as OMC's) is reviewable in the Illinois Appellate Court and not in either a state or federal enforcement action.

Here the facts are clear. OMC's permit was issued and administered by IEPA. No affirmative action was taken by EPA to repudiate that permit. Federal review of the permit is therefore barred.

OMC had at least two options available. First, it could have challenged the mandated Method 608 test procedure before IEPA and, if unsuccessful, sought review in the Illinois Appellate Court. Second, it could have challenged EPA's approval of the entire Illinois NPDES system, as is authorized by Section 1369(b)(1)(D).[10] It chose neither. By failing to exhaust its available remedies, OMC is forced to live with its permit terms—including the required use of Method 608—in this enforcement action.

Opinion at 819–21 pointed out there is no factual issue as to the nonconformity of OMC's PCB levels as measured by Method 608. That remains true. Summary judgment as to the existence of PCB violations must be granted in favor of NRDC.

### Conclusion

As the issues have been re-posed by NRDC's second attempt at summary judgment, there is no genuine issue of material fact and NRDC is entitled to a judgment as a matter of law. That means the existence of OMC's PCB violations—of OMC's *liability* in that respect—has been legally established. But that is not the end of the PCB case: Opinion at 822–23 identifies issues remaining to be resolved, and the overall question of the appropriate remedy must be dealt with. This action is set for a status hearing at 9 a.m. January 20, 1989 to determine the further course of the litigation.

---

9. That is scarcely a surprising result, given the fact that Section 1369(b) consistently speaks of reviewing action of "the Administrator"—the head of the federal agency. Thus Section 1369(b)(1)(F) allows review of the Administrator's action "in issuing or denying any permit under [S]ection 1342." Moreover, where EPA simply decides not to act on a state-issued permit, there may very well be no record of that action available for review (*Schramm*, 631 F.2d at 859–60). And see *Mianus River Preservation Comm. v. Adm'r, EPA*, 541 F.2d 899, 906 (2d Cir.1976), pointing out federal review of a state-issued permit might involve "review[ing] issues involving only a State agency's application and interpretation of purely State law."

10. EPA may order revocation of a state program, based on failure to comply with EPA regulations, in response to a petition from any interested person (Reg. § 123.64(b)(1)).