**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Plaintiff,**

**v.**

**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION, Defendant.**

**No. 88 Civ. 3748 (LLS).**

United States District Court, S.D. New York.

July 25, 1989.

Brent L. Brandenburg, Consolidated Edison Co. of New York, Inc., New York City, for plaintiff.

Stuart Miller, Asst. Atty. Gen., New York State Dept. of Law, New York City, for defendant.

## OPINION AND ORDER

STANTON, District Judge.

Defendant moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and (6). The motion is granted.

## BACKGROUND

Plaintiff Consolidated Edison Company of New York, Inc. ("Con Ed") owns and operates Indian Point Unit No. 2 Nuclear Generating Station ("Indian Point"), Ravenswood Generating Station ("Ravenswood"), and Arthur Kill Generating Station ("Arthur Kill"). Defendant New York State Department of Environmental Conservation ("DEC") is a state agency responsible for carrying out the state's environmental policy. N.Y. Envtl. Conserv. Law ("ECL") § 3-0301 (McKinney's 1989 Supp.); *see also* Weinberg, *Practice Commentary*, ECL § 3-0101 (McKinney's ed.).

Under Section 402(a) of the federal Water Pollution Control Act Amendments (commonly referred to as the "Clean Water Act", hereinafter the "Act" or "CWA"), 33 U.S.C. § 1342(a), the Administrator of the federal Environmental Protection Agency ("EPA") regulates anyone wishing to discharge pollutants into waterways, through the issuance of National Pollutant Discharge Elimination Systems ("NPDES") permits. The NPDES permits "transform generally applicable effluent limitations and other standards ... into the obligations of the individual discharger." *EPA v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976). Compliance with a permit is generally deemed to constitute compliance with the Act's requirements. *Id.* § 1342(k).

Recognizing "the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution," *Id.* § 1251(b), Section 402(b) allows a state to apply to the EPA to take responsibility of issuing NPDES permits to those who wish to discharge pollutants into navigable waters within its boundaries. A state can qualify to "establish and administer under State law" its own NPDES program only if the state attorney general submits "a statement ... that the laws of such State ... provide adequate authority to carry out the described program." *Id.* § 1342(b). Among other requirements, the state must certify that it has adequate authority "[t]o abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." *Id.* § 1342(b)(7). Section 510 allows States to adopt and enforce limitations on the discharge of pollution more stringent than those adopted under the Act. *Id.* § 1370.

Permit applications to the state are subject to EPA review under Section 402(d).[1]

Between 1971 and 1974 Con Ed, Central Hudson Gas & Electric Corporation ("Central Hudson"), and Orange & Rockland Utilities ("O & R") applied to the EPA for NPDES permits for several power plants located on the Hudson River, including Indian Point. The EPA issued permits requiring the retrofitting of the power plants with cooling towers which would reduce the thermal heat from them by ninety percent. The utilities objected to the permits because of the cost of the cooling towers, and requested adjudicatory hearings before the EPA.

Before the hearings started, the EPA Administrator approved New York State's Pollutant Discharge Elimination System permit program ("SPDES") pursuant to Section 402(b). DEC then intervened as a party in the hearings. 40 C.F.R. § 124.79. For a more detailed history of those proceedings, see *Central Hudson Gas & Electric Corp. v. EPA*, 587 F.2d 549 (2d Cir. 1978).

The dispute was never resolved by an adjudicatory hearing. Instead Con Ed, Central Hudson, O & R, the EPA, the DEC, and others reached a Settlement Agreement (the "Agreement") on December 19, 1980. The Agreement was conditioned on the EPA either terminating with prejudice all issues in the adjudicatory hearings or otherwise ending its role with respect to the cases. The Agreement contemplated that the state DEC would monitor Con Ed's, Central Hudson's and O & R's compliance with the CWA under SPDES permits. Specifically, Section 3.B(i) of the Agreement provided that

> DEC, in accordance with applicable law, shall issue to each of the Utilities SPDES permits for their respective Hudson River plants which will permit, during the entire ten-year term of this Agreement, continued operation with the existing once-through cooling systems unaltered by thermal or intake requirements, subject only to performance by the Utilities of their respective covenants as set forth in this Agreement.

On December 16, 1987 DEC wrote Con Ed and the Power Authority of the State of New York ("PASNY"), Con Ed's co-permittee of the SPDES permit for Indian Point, of its intent to modify the Indian Point SPDES permit by adding two new conditions.[2]

The first condition requires:

> During all times that a circulating water pump is operating, the intake travelling

---

1. "Each state shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issue by such state." 33 U.S.C. § 1342(d).

2. ECL § 17–0815.6 states that SPDES permits may be modified ... where the [DEC] finds. [sic]

a. a violation of any term of the permit;

b. that the permit was obtained by misrepresentation or failure to disclose fully all relevant facts; or

c. a change in conditions or the existence of a condition which requires either a temporary or permanent reduction or elimination of the authorized discharge.

screen servicing that pump shall be in continuous wash mode. Impinged debris and fish, including those fish that may not be viable, are to be returned to the Hudson River using existing screens and sluiceways. The screen washwater discharge point will be modified as necessary to insure return to the river rather than onto a bank or ice flow. The design of any grate installed to prevent clogging of the screen wash-water return sluice shall be submitted for Department review 20 days prior to installation. Fixed screens on the intake should be blocked in the up position while travelling screens are operating so that viable fish are returned to the river. During impingement monitoring studies, fixed and travelling screens may be operated in ways consistent with achieving study objectives. Complaint ¶ 16.

The second condition requires:

The permittee shall submit written notification, to include detailed descriptions and appropriate figures, to the DEC Chief, Bureau of Environmental Protection, to the Regional Supervisor for Natural Resources and the Regional Engineer at least 60 days in advance of any change which would result in the alteration of the permitted operation, location, design, construction or capacity of the cooling water intake structures. The permittee shall submit, with its written notification, a demonstration that the change reflects the best technology currently available for minimizing adverse environmental impact. Prior DEC approval is required before initiating such change. *Id.* at ¶ 17.

Con Ed and PASNY submitted statements opposing the modifications, and PASNY requested a hearing pursuant to ECL § 17–0907. That hearing has not yet been held.

On March 30, 1988 the DEC issued for public comment draft SPDES permits for Arthur Kill and Ravenswood. Those draft permits contain modifications virtually identical to the new Indian Point conditions and also require Con Ed to conduct impingement and entrainment monitoring studies.

On May 31, 1988 Con Ed commenced this action, seeking a declaratory judgment under 28 U.S.C. § 2201 that the modifications for the Indian Point SPDES permit are "unauthorized by the CWA, contrary to New York State's EPA-approved permitting program under the CWA, and contrary to the terms of the ... Settlement Agreement." *Id.* at p. 11. Con Ed asserts as pendent claims that the draft permits for Arthur Kill and Ravenswood are "contrary to the CWA, New York State's EPA-approved permitting program under the CWA, and the [DEC's] authority under Article 17, Title 8 of the ECL." [3] *Ibid.* Plaintiff alleges this court has jurisdiction under 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

On June 29, 1988 DEC informed Con Ed and PASNY that "Upon reconsideration, we have decided to withdraw any such intent to modify your existing permit at this time and without prejudice to any future course of action." Counsel for DEC states "Although DEC continues to reserve its rights as expressed in the [June 29, 1988] letter, I am authorized to certify to the court, and do so certify, that at this time DEC does not foresee proposing any relevant modification of the permit to take effect before the expiration date of the settlement agreement...." Declaration of Stuart Miller in support of motion to dismiss, dated July 8, 1988, at ¶ 10.

Defendant moves to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and (6) on the grounds that: 1) this court lacks subject matter jurisdiction; 2) this action is barred by the Eleventh Amendment, U.S. CONST. amend. XI; 3) plaintiff's claims are not ripe for judicial review; 4) plaintiff has not exhausted its administrative remedies; 5) plaintiff's claims are moot; 6) this

---

**3.** Title 8 establishes the SPDES permit program "which enables New York to take over enforcement of effluent discharges from the federal authorities pursuant to the [CWA]." Weinberg, *Practice Commentary,* ECL § 17–0801 (McKinney's ed.).

court should abstain from exercising jurisdiction under *Buford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); and 7) this court should abstain from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

## DISCUSSION

*Jurisdiction*

### 1. Mootness

■ When a court is presented with issues that "are no longer 'live' ", the case is moot and therefore outside the court's jurisdictional authority. *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). DEC argues that Con Ed's challenge to the modification is no longer "live" because it has withdrawn the modification, and "does not foresee renewing the proposal to take effect before the expiration of the ... agreement." However, "voluntary cessation of allegedly illegal conduct ... does not [necessarily] make the case moot." *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). It is only when the defendant can demonstrate that it is *"absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur" that the case no longer presents a live, justiciable controversy. *Gwaltney of Smithfield v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987) quoting *U.S. v. Phosphate Export Association, Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) (emphasis in *Gwaltney*). The defendant's burden in this regard "is a heavy one." *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897.

Here, plaintiff's counsel states that the DEC does not "foresee proposing any relevant modification of the permit". Such a statement does not demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See Upjohn Co. v. American Home Products Corp.*, 598 F.Supp. 550, 555 (S.D.N.Y.1984) (narrowly

drawn affidavits claiming abandonment of allegedly wrongful conduct are insufficient to meet defendant's heavy burden). Counsel's statement, furthermore, expressly allows for re-imposition of the conditions after the expiration of the Settlement Agreement (which will occur on or about May 14, 1991, according to Complaint par. 12), at which time one may expect these issues would re-appear, except for the argument that the conditions violated the Settlement Agreement.

Accordingly, Con Ed's challenge to the modification is not moot.

### 2. Subject Matter Jurisdiction

Plaintiff asserts this court has subject matter jurisdiction because 1) its claim that DEC's modifications would violate the CWA "necessarily depends on resolution of a substantial question of federal law", Ptf's memo in opp. at 16, and 2) the settlement agreement is a contract[4], and that contract is governed by federal common law because the government is a party to it.

### A. *The CWA*

Adjudicating the claim that the intake requirements violate the CWA would require interpretation of a federal statute, thus providing jurisdiction under 28 U.S.C. § 1331. In *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board*, 495 F.Supp. 1229, 1234 (E.D.Va.), *reh'g denied*, 501 F.Supp. 821 (1980) environmental groups alleged that a state-issued NPDES permit violated the CWA. The court held that it had jurisdiction:

> The Act necessarily requires that the state program be administered in accordance with the federal requirements. Indeed, that is the subject of the EPA's oversight function. Plaintiffs contend that the issuance of the ... permit violated the Act's requirements in several respects. The allegations would thus necessitate an interpretation of a federal statute which is the heart of jurisdiction under 28 U.S.C. § 1331.

**4.** The parties do not dispute that the Agreement is a contract.

*See also District of Columbia v. Schramm,* 631 F.2d 854, 863 n. 15 (D.C.Cir. 1980).

### (i) Absence of claim for relief under CWA

■ Defendant argues, however, that plaintiff does not have a cause of action under the CWA.[5] The Act does not expressly authorize a permittee under a state-issued NPDES permit to bring suit against the state, challenging its determination made with regard to the permit. The permittee can only bring suit to seek review of the EPA Administrator's action in "making any determination as to a State permit program submitted under section [402(b)]." 33 U.S.C. § 1369(b)(1)(D).[6]

Thus, plaintiff's claim that the intake requirements would violate the CWA can only be brought if it has an implied cause of action under the statute.

In *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) the Supreme Court held that there was no implied private right of action in either the CWA or the Marine Protection, Research, and Sanctuaries Act of 1972 ("MPRSA"), 33 U.S.C. §§ 1401–1445. Respondents, an organization whose members harvested fish and shellfish off the coasts of New York and New Jersey, and one individual member, sued various governmental entities and officials from New York, New Jersey, and the Federal Government. They alleged that the EPA and the Army Corps of Engineers violated the MPRSA and the CWA by allowing the New York and New Jersey defendants to discharge and dump pollutants in amounts that were not permitted by the Acts and that the New York and New Jersey defendants violated the terms of their NPDES permits.

Respondents brought their action under the "citizen suit" provisions of both Acts. 33 U.S.C. § 1365(b)(1)(A)[7] and 33 U.S.C. § 1415(g). These provisions "allow[ ] suit under the Act[s] by private citizens, but authorize[ ] only prospective relief, and the citizen plaintiffs first must give notice to the EPA, the State, and any alleged violator." *Middlesex County,* 453 U.S. at 6, 101 S.Ct. at 2619. Plaintiffs, having failed to give the requisite notice, claimed they had implied private rights of action under the CWA and MPRSA.

The Supreme Court held that

These Acts contain unusually elaborate enforcement provisions, conferring authority to sue for this purpose both on government officials and private citizens. [*id.* at 13, 101 S.Ct. at 2622]

In view of these elaborate enforcement provisions it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under MPRSA or [CWA]. [*id.* at 14, 101 S.Ct. at 2623]

Indeed the Reports and debates provide affirmative support for the view that Congress intended the limitations imposed on citizen suits to apply to all

---

**5.** *See Chesapeake Bay,* 501 F.Supp. at 823 ("Jurisdiction, of course refers to the Court's power to entertain a controversy. [This] Court determined that it was vested with the authority to render a decision in this matter. Plaintiffs' ... contentions ... ignore the fact that jurisdiction is a concept quite apart from the issue of whether the plaintiffs have a cause of action to assert. In the Court's opinion, the two issues are distinct. ...")

**6.** That suit must be brought in the "Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person. Any such application shall be made within 120 days from the date of such determination. ..." 33 U.S.C. § 1369(b)(1).

**7.** Section 1365(b)(1) provides that any citizen may commence a civil action on his own behalf

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties. ...

private suits under these Acts. Thus, both the structure of the Acts and their legislative history lead us to conclude that Congress intended that private remedies in addition to those expressly provided should not be implied. Where, as here, Congress has made clear that implied private actions are not contemplated, the courts are not authorized to ignore this legislative judgment. *Id.* at 17–18, 101 S.Ct. at 2624–25 (footnote omitted).

Since plaintiff has neither an express nor an implied right of action under the CWA, its claim that the intake requirements would violate the Act must be dismissed. If Con Ed wishes redress, it must seek it in the state courts under ECL § 17–0909.[8] *Accord District of Columbia,* 631 F.2d at 863 ("The state courts are the proper forums for resolving questions about state NPDES permits"); *Natural Resources Defense Council, Inc. v. Outboard Marine Corp.,* 702 F.Supp. 690, 694 (N.D.Ill.1988) (direct review of state-issued permits is confined to state courts).

B. *The Agreement*

■ This court has jurisdiction under 28 U.S.C. § 1331 if federal common law applies to plaintiff's claim that the intake requirements violate the Agreement. *Illinois v. Milwaukee,* 406 U.S. 91, 98–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972). That the government is a party to the contract "is only the beginning and not the end, of the analysis, where as here the contract is relied upon in a dispute between private parties." *American Invs–Co Countryside, Inc., v. Riverdale Bank,* 596 F.2d 211, 217 (7th Cir.1979).

In deciding whether to apply federal common law, "normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must be specifically shown." *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct.

1301, 1304, 16 L.Ed.2d 369 (1966) (citation omitted).

The only reference in the CWA to cooling water intake structures is found in Section 316(b): "Any standard established pursuant to section [301] of this title or section [306] of this title and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact." 33 U.S.C. § 1326(b).

Case law conflicts over whether intake requirements can be imposed as a condition of a permit. *Compare National Resources Defense Council v. U.S. E.P.A.,* 859 F.2d 156, 170 (D.C.Cir.1988) (the EPA "is powerless to impose permit conditions unrelated to the discharge itself") *with U.S. Steel Corp. v. Train,* 556 F.2d 822, 850 (7th Cir.1977) ("§ 402(a)(1) implicitly requires the Administrator to insure compliance with § 316(b) as one of the permit conditions.") Thus, it is unclear whether there is a federal policy favoring the imposition of intake requirements as a condition of a permit.

Even assuming such a policy, the EPA appears to have waived it when it agreed that the DEC would issue SPDES permits that would permit continued operation of the plants "with the existing once-through cooling systems unaltered by ... intake requirements." As a result, the question presented by plaintiff's breach of contract claim is not whether in general the EPA or the State have the power to impose intake requirements. It is far narrower: whether under the terms of the Settlement Agreement the DEC can impose intake requirements. Application of state law to that question would in no way bind the EPA or the DEC from imposing intake requirements in other permits. Thus, application of state law here would not conflict with federal policy favoring the imposition of intake requirements as a condition of permits.

---

8. "All orders or determinations of the commissioner or the department shall be subject to review as provided in article 78 of the Civil Practice Law and Rules. Application for such

review must be made within sixty days after service in person or by mail of a copy of the determination, or decision upon the attorney of record for the applicant...."

Finally, the contract dispute raises "no questions regarding the liability of the United States or the responsibilities of the United States under the contract [ ]." *Miree v. DeKalb County, Georgia*, 433 U.S. 25, 28–29, 97 S.Ct. 2490, 2493–94, 53 L.Ed.2d 557 (1977). Thus, resolution of plaintiff's breach of contract claim would have no direct effect upon the United States.

Because application of state law to resolve plaintiff's breach of contract claim will not conflict with any federal policy and only the rights of private litigants are at issue here, state law, rather than federal common law, would be applied to plaintiff's claim under the contract.

Accordingly, plaintiff's claim that the intake requirements would violate the Agreement does not invoke federal jurisdiction.

### C. *Pendent Claims*

■ Plaintiff apparently described its claims concerning the Ravenswood and Arthur Kill draft permits as "pendent" because those stations were not part of the Agreement. However, plaintiff's claim that the draft permits would violate the CWA presents a federal question, but for the reasons stated in 2A(i) above, that claim fails to state a cause of action under the Act. Plaintiff's claim that the draft permits violate ECL, Title 17, Article 8 is a state-law claim. Where the federal claims are dismissed prior to trial, the state claim should be dismissed, as well. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

### CONCLUSION

Defendant's motion to dismiss the complaint is granted. The Clerk of the Court shall enter judgment dismissing the complaint.